**Jack Wayne REEVES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–96–196–CR.**

Court of Appeals of Texas,
Waco.

May 6, 1998.

474

Wes Ball, Ball & Hase, Arlington, for appellant.

B.J. Shepherd, Criminal Dist. Atty., Martin L. Peterson, Asst. Dist. Atty., Meridian, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

Jack Wayne Reeves was charged by indictment with the murder of his wife, Emelita Reeves.[1] A jury returned a verdict of guilty and assessed confinement for 99 years and a fine of $10,000. Reeves appeals his conviction on eleven points, claiming both constitutional and non-constitutional error. Among other things, we hold that offering evidence of one's refusal to consent to a warrantless search is violative of the Fourth Amendment. We likewise hold that certain out-of court conduct is inadmissible to infer guilt. Finding any error to be harmless under Rule 44.2, we will affirm the judgment.

## FACTS

Reeves was convicted on what the State concedes is a completely circumstantial case. That being true, the facts are unclear as to when, where, and how Emelita lost her life. It is undisputed that October 11, 1994, was the last night anyone other than Reeves saw Emelita alive.

Reeves retired from the military in 1985 and bought a house in Arlington, Texas. In search of companionship, he began a relationship with Emelita, who resided in the Philippines, through a dating magazine called Cherry Blossoms. In 1987, they were married and, except for a two year period when Emelita went back to the Philippines to give birth to their son, Kendall, resided in Arlington throughout the marriage. There is little dispute that this was a non-traditional marriage. Reeves married Emelita for female companionship, and she married him so her family could be financially secure and she could live in the United States.

Apparently, Emelita led various lifestyles. She had several Filipino friends in the Arlington/ Fort Worth area, and she spent a great deal of time with them; however, Reeves was never a part of her social life. She did, however, occasionally go camping with Reeves at Lake Whitney. Emelita did not work, and normally spent days with one group of friends and nights with another. One of her close friends was Monalisa Pate. Like Emelita, Pate was from Cebu City in the Philippines. Because Emelita did not work and Pate did not have a car, it became normal for Emelita to take Pate to work and pick her up. Pate was the first person to contact the police with concerns about Emelita's well-being.

On October 11, 1994, after having lunch with friends, Emelita went to the mall to buy a leather jacket. Around 4:00 p.m., she received a "page" from Reeves telling her to come home. It is unclear whether she actually went home at that time or not. Around 6:00, Emelita arrived at Pate's house to take her to work. Emelita dropped Pate off and apparently went home. Around 10:00, Pate called Emelita, who explained that she would be unable to pick Pate up when the shift ended because a phone call was expected from the Philippines. At 11:00, Pate tried paging and calling Emelita again, but there was no response. Other friends tried calling around this time as well. Finally, at midnight, Reeves answered the phone, but because Pate did not want to talk to him, she hung up. The next day, Pate continued trying to reach Emelita, but without success. About 9:00 p.m. on October 12, Pate and Arnold Bowlin went to Reeves' home to see if Emelita was there. Not seeing Emelita's car, they called the police.

---

**1.** We previously affirmed Reeves' conviction for the murder of another wife, Sharon Reeves, in an unpublished opinion. *See Reeves v. State*, No. 10–97–038–CR (Tex.App.—Waco 1997) (not designated for publication).

Officers Thomas "Chip" Oxedine and Douglas Hirschman responded to the call. Seeing Reeves "somewhat crouched" in the garage, Hirschman asked him to come out. The officers explained that they had received a call concerning Emelita's safety and asked Reeves if he could help them out. Reeves stated that she often leaves for long periods of time, and that his only concern was that she was not there to properly take care of Kendall. Believing Reeves' behavior to be somewhat suspicious, the officers asked permission to check the inside of the house, but Reeves declined to allow them into his home.

On October 20, Reeves gave a voluntary written statement to the police. He stated he had not heard from or seen Emelita since October 11 when she left their home to go to Dita Hayes' house. Emelita was never seen again. It was not until approximately October 1, 1995, that Emelita's body was found. Shortly thereafter, Reeves was charged with her murder.

### THE STATE'S EVIDENCE

The State called approximately seventy witnesses to testify about the events surrounding Emelita's disappearance and the recovery of her body, her relationship with Reeves and others, and Reeves' behavior both before and after her disappearance. The State presented no eyewitnesses, no forensic evidence, and no manner of death. Prosecutors conceded they had no idea how Emelita died. Her body had been disturbed by scavengers, leaving little to be discovered through an autopsy.

On the other hand, the State did produce a significant amount of circumstantial evidence against Reeves. Emelita was last seen on October 11, 1994. On October 12, Reeves replaced his old sofa-sleeper with a new couch. Evidence showed he cut the arms off the old couch so it would fit in the back of his truck and took the mattress out, making room for a body similar in size to Emelita's to fit inside. Receipts from Lake Whitney showed Reeves was there on October 12–13, placing him at the site where Emelita's remains were eventually found.

Testimony revealed that Reeves washed his truck the morning of October 13. Emeli-ta's clothing, jewelry, cellular phone, pager, and personal items were found in Reeves' possession. Many witnesses testified she was never without her rings, cellular phone, and pager. Finally, there was testimony that Emelita would not have left Reeves without her son, Kendall.

Officer Oxedine testified he saw a utility vehicle similar to Emelita's Nissan Pathfinder in Reeves' garage the day after she was reported missing. In his statement to the police, Reeves denied any such vehicle was ever in his garage, stating there was only a motorcycle in the garage that day. The next day the Pathfinder was found "abandoned" in the Hypermart parking lot in Arlington. Friends testified that the Pathfinder was not in the position it would have been if Emelita had been the last person to drive it. Namely, the child's car seat was missing, the steering wheel was in the wrong position, and the seat was moved too far back for her to reach the pedals. Furthermore, the keys to the vehicle were found in Reeves' possession. Reeves had a neighbor, Edward Conston, sign a statement saying the last time he saw Emelita's Pathfinder was October 13, 1994. Although the statement made references to occurrences in December, Conston testified he signed it sometime in October, leaving the jury to question its reliability.

Reeves told contradicting stories about Emelita's personal items. He told the police she had her pager and phone with her, while he told others that she left her phone at home on its battery charger. Bills for the cellular phone indicated Reeves began placing calls with it on October 14.

Reeves' son Randall testified that shortly after Emelita's disappearance he saw his father cutting out sections of the carpet in the hallway. Within days of Emelita's disappearance, Reeves had the old carpet replaced. He was asked to keep the old carpet so it could be tested for evidence, but he did not. He stated to the police that he had told the carpet installer to save it, but the installer said Reeves paid him extra to haul it off.

When asked about Emelita's whereabouts, Reeves told the police she was with Pate. About the same time he told Pate that Eme-

lita was with Dita Hayes. He told the police that Emelita must be somewhere engaged in prostitution because she continued to send money to her family in the Philippines, but the evidence revealed it was Reeves who was sending money to the Philippines in Emelita's name.

Nine days after Emelita disappeared, Reeves attempted to sell the Pathfinder, stating he did not want to pay insurance on it. Within a couple of weeks, he demanded his money back on the leather jacket that Emelita had put on lay-away on October 11. Reeves began looking for a new "life partner" through the Cherry Blossoms magazine in January of 1995. This was the same magazine through which he first found Emelita. Reeves filed for divorce in February of 1995.

As for motive, the State showed Reeves was very upset to hear that Emelita was seeing another man, Tony Dayrit. Although he did not mind Emelita's lesbian relationships, he was jealous of other men. Also, evidence suggested Reeves did not want Emelita to take their son, Kendall, if she left. He had told Emelita he would give her money if she wanted to leave, but that he would do anything to keep her from taking Kendall. Finally, there was evidence of physical abuse. Testimony revealed Reeves had hit Emelita on more than one occasion, and on the last day Emelita was seen alive, she was extremely upset because Reeves had pulled her hair and choked her.

## THE DEFENSIVE EVIDENCE

Reeves showed the jury that Emelita married him for financial stability and for the opportunity to live in the United States. He portrayed her as a woman who lived an alternative lifestyle, staying out late nights and having affairs with both men and women. He also portrayed her as a liar.

Reeves relied on discrepancies in the State's witnesses' testimony and questioned the innocence of others. For example, Lynne Combs received two pages on her pager on October 13 at 1:00 a.m. and 7:00 a.m. The phone number was that of National Semiconductor, where Dayrit worked. The number had the digits 9–1–1 following it.

Although Reeves did not testify, his counsel explained to the jury that this could have been Emelita telling Combs she was in trouble and that National Semiconductor "is the source of her stress." Also, Reeves tried to place suspicion on a "mystery man" who had called Dayrit around the time of Emelita's disappearance, spoken a Filipino language, and claimed to be Kendall's father. Reeves questioned who this mystery man could be and whether he could have had anything to do with Emelita's disappearance.

## SUFFICIENCY OF THE EVIDENCE

In his tenth and eleventh points, Reeves complains that the evidence is legally and factually insufficient to support a finding of guilty beyond a reasonable doubt.

### Legal Sufficiency

In determining whether the evidence is legally sufficient to support the verdict, we view the evidence in the light most favorable to the verdict, asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Lane v. State,* 933 S.W.2d 504, 507 (Tex.Crim.App.1996) (citing *Jackson v. Virginia,* 443 U.S. 307; 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)). This standard is the same for both direct and circumstantial evidence cases. *Green v. State,* 840 S.W.2d 394, 401 (Tex.Crim.App. 1992); *Geesa v. State,* 820 S.W.2d 154, 156–61 (Tex.Crim.App.1991). Under the *Jackson* standard, we do not position ourselves as a thirteenth juror in assessing the evidence; rather, we position ourselves as a final, due-process safeguard ensuring only the rationality of the factfinder. *See Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988). The trier of fact is the sole judge of the weight and credibility of the witnesses and may believe or disbelieve all or any part of any witness' testimony. *Williams v. State,* 692 S.W.2d 671, 676 (Tex.Crim.App.1984). We do not resolve any conflict in fact or evaluate the credibility of the witnesses. *See Juarez v. State,* 796 S.W.2d 523, 524 (Tex. App.—San Antonio 1990, pet. ref'd). The evidence is not rendered insufficient merely because the appellant presents a different version of the events. *Turro v. State,* 867

S.W.2d 43, 47 (Tex.Crim.App.1993). We have only the discretion to determine if any rational trier of fact, considering the evidence admitted at trial, could have found the essential elements of the offense beyond a reasonable doubt. *See Rodriguez v. State*, 819 S.W.2d 871, 873 (Tex.Crim.App.1991) (*citing Fernandez v. State*, 805 S.W.2d 451, 456 (Tex.Crim.App.1991)).

▪ Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89. Reeves urges that because we do not know the cause of death, time of death, or location of death, a rational jury could not find from the evidence presented all the elements of the crime beyond a reasonable doubt. We disagree.

▪ When the evidence adduced at trial leaves uncertain the means used or the precise cause of the death of the deceased but creates no doubt that the deceased was killed by the acts of the accused, it is sufficiently proved. *Clark v. State*, 151 Tex.Crim. 383, 384–85, 208 S.W.2d 637, 638 (1948). From the evidence detailed above, a rational jury could find beyond a reasonable doubt that Emelita was the victim of a criminal homicide and that the evidence pointed to Jack Reeves. The jury could have believed from the nature of his actions immediately after Emelita's disappearance that he was hiding something. He was the last one to see Emelita alive. He had the best opportunity and motive for killing her. She did not love him, and wanted to be around him as little as possible. The jury could accept that he was very jealous of the other intimate relationships Emelita was having. He became nervous and told conflicting stories when questioned about Emelita's whereabouts. He "went camping" the day after she disappeared in the area where her body was eventually found. He disposed of his sleeper sofa and replaced the carpet in his home. He had his truck washed immediately after she disappeared. The jury was free to infer that he was attempting to get rid of incriminating evidence. Although it is true that there is no physical evidence of foul play, such evidence is not necessary. Considering only the evidence which weighs in favor of the verdict, we find that a rational jury could find Reeves guilty of murder beyond a reasonable doubt. *Lane*, 933 S.W.2d at 507. Point ten is overruled.

### Factual Sufficiency

▪ In conducting a factual sufficiency review, we view all the evidence without the prism of "in the light most favorable to the prosecution" and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996); *Stone v. State*, 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, pet. ref'd, untimely filed).

Reeves' view of the evidence is best summed up by his closing arguments:

> Jack's a weird guy. Jack's a paranoid guy. Jack's dysfunctional. There isn't any question about that. Those are not elements of the offense and I have— I believe after you have heard this testimony in this case you don't like Jack Reeves. That's not one of the elements of the offense.
>
> . . .
>
> There's nothing in these instructions if you find Jack's a weird guy, if you find Jack's a strange guy, if you find Jack's a nervous guy, if you find Jack's a paranoid guy that he's guilty. That's not in here, because that's not our law.

Although Reeves tried to discredit the majority of the evidence against him, the jury could have chosen to believe the testimony of the seventy-plus witnesses for the State, and disbelieved the inferences he raised. Reeves tried to raise questions regarding other potential suspects, but the jury, as the sole judges of the credibility of the witnesses and the weight to be given the evidence, could have disregarded his evidence as weak and unreliable. *Clewis*, 922 S.W.2d at 139.

The crux of his defense was to challenge the evidence offered by the State, attempting to show rational explanations for his behavior

and pointing to the lack of "hard" evidence against him.

> They have proved Jack's weird. They proved that there is inconsistencies, but that does not equal the elements of murder, Ladies and Gentlemen. This is your decision and your decision alone. I can't prove somebody else did it, but they, these people, have to prove that he did it and no one else in the world beyond a reasonable doubt. There's no witness that says he killed her. There is no confession he killed her. There is no scientific evidence that he killed her. And all of that, Ladies and Gentlemen, adds up to a reasonable doubt.

After reviewing all of the testimony outlined above, including Reeves' behavior both before and after Emelita's disappearance, the fact that he had previously abused Emelita, and the apparent steps taken to cover up events surrounding her disappearance, we cannot say that the jury's verdict is so against the overwhelming weight of the evidence as to be manifestly unjust. *Id.* at 129. Point eleven is overruled.

### THE GATHERING OF EVIDENCE

In his eighth and ninth points, Reeves complains that the court erred in admitting evidence seized outside the scope of a search warrant in violation of the Fourth Amendment to the United States Constitution, Article I, Section 9 of the Texas Constitution, and Chapter 18 of the Code of Criminal Procedure.

The search warrant, issued by a Tarrant County Magistrate on March 21, 1995, provided for the following property and items to be seized:

1) trace evidence from the human body;
2) carpet samples;
3) earth soil samples;
4) cellular phone belonging to Emelita Reeves;
5) phone bills and service charges for item 4;
6) phone pager belonging to Emelita Reeves;
7) service charge bills for item 6;
8) car keys with attached car alarm control switch for 1993 Nissan Pathfinder;
9) documents of identification, birth certificate, and residence for the United States and Philippines for Emelita Reeves;
10) clothing, jewelry, and all personal items belonging to Emelita Reeves;
11) written correspondence to or from Emelita Reeves;
12) diaries belonging to Emelita Reeves;
13) life insurance policies listing Jack Reeves as the beneficiary upon the death of Emelita Reeves;
14) photographs, drawings, movies, and video tapes of Emelita Reeves;
15) lease agreements for storage facilities;
16) documents and articles of personal property tending to establish the identity of persons in control of the area to be searched.

The items which Reeves complains were improperly seized include a check to his divorce attorney, a check to a carpet installer, a "Lonely Hearts" advertisement, a Filipino marriage contract, and a form letter to a pen pal club. He objected to the admission of these items on grounds that they were not named in the warrant and exceeded the scope of the warrant. Because none of these items could be considered contraband, fruits, or instrumentalities of a crime, they are identified as "mere evidence." To determined whether these items were properly seized and subsequently admitted into evidence, a review of the rules regarding searches in which "mere evidence" may be seized is appropriate.

Before 1967, general exploratory searches for and seizures of "mere evidence," as opposed to the "fruits or instrumentalities" of crime, were impermissible under any circumstances. *United States v. Lefkowitz,* 285 U.S. 452, 464, 52 S.Ct. 420, 423, 76 L.Ed. 877 (1932); *Harris v. United States,* 331 U.S. 145, 154, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399 (1947); *Abel v. United States,* 362 U.S. 217, 237–38, 80 S.Ct. 683, 696, 4 L.Ed.2d 668 (1960). The restriction was based, in part, on the premise that such a search violated both the Fourth and Fifth Amendments. *Boyd v. United States,* 116 U.S. 616, 629, 6

S.Ct. 524, 532, 29 L.Ed. 746 (1886) ("Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony, or of his private papers to be used [citation omitted] as evidence to convict him of crime, or to forfeit his goods, is within the condemnation of that judgment. In this regard the fourth and fifth amendments run almost into each other.").

The United States Supreme Court's 1967 decision in *Warden v. Hayden* changed that. *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). There, the question was whether clothing seized during a search of Hayden's home was properly admitted into evidence against him. The Court observed that "nothing in the language of the Fourth Amendment supports the distinction between 'mere evidence' and instrumentalities, fruits of crime, or contraband." *Id.* at 301, at 1647, 87 S.Ct. 1642. The rights granted by the Fourth Amendment were found to be unrelated to the "mere evidence" limitation. *Id.* "We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts." *Id.* at 303, 87 S.Ct. at 1648. "Privacy is disturbed no more by a search directed to a purely evidentiary object than it is by a search directed to an instrumentality, fruit, or contraband." *Id.* at 301–02, 87 S.Ct. at 1647. Further, the "items of clothing involved in this case are not 'testimonial' or 'communicative' in nature, and their introduction therefore did not compel respondent to become a witness against himself in violation of the Fifth Amendment." *Id.* at 302–03, 87 S.Ct. at 1648. Thus, the premise "that the government may not seize evidence simply for the purpose of proving crime has likewise been discredited." *Id.* at 306, 87 S.Ct. at 1649.

"There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities, or contraband—between the item to be seized and criminal behavior. Thus, in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Id.* at 307, 87 S.Ct at 1650.

The Court further observed (1) Congress had never authorized federal search warrants for "mere evidence" and (2) the "mere evidence" rule had become a problem for the states only after the decision in *Mapp v. Ohio* in 1961. *Id.* at 308, 87 S.Ct at 1650–51 (citing *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court)).

The issuance and service of search warrants in Texas is governed by Chapter 18 of the Code of Criminal Procedure, which was revised in 1965 and has been amended multiple times since. *See* TEX.CODE CRIM. PROC. ANN. arts. 18.01–.21 (Vernon Supp.1998). Initially, Article 18.01 defined a "search warrant" as:

... a written order, issued by a magistrate, and directed to a peace officer, commanding him to search for personal property, and to seize the same and bring it before such magistrate; or it is a like [sic] written order, commanding a peace officer to search a suspected place where it is alleged stolen property is commonly concealed, or implements kept for the purpose of being used in the commission of any designated offense.

No search warrant shall issue for any purpose in this State unless a sworn complaint therefor shall first be filed with the issuing magistrate setting forth sufficient facts to satisfy the magistrate that probable cause does in fact exist for its issuance.[2]

Article 18.02 set forth reasons for issuing a search warrant. Included were:

1. To discover property acquired by theft or in any other manner which makes its acquisition a penal offense;

2. To search suspected places where it is alleged property so illegally acquired is commonly kept or concealed;

---

2. Act of 1965, 59th Leg, R.S., ch. 722, 1965 Tex. Gen. Laws 317, 382.

3. To search places where it is alleged implements are kept for use in forging or counterfeiting;

4. To search places where it is alleged arms or munitions are kept or prepared for the purpose of insurrection or riot; and

5. To seize and bring before a magistrate any such property, implements, arms and munitions.[3]

Because searches for "mere evidence" were impermissible in 1965, Chapter 18 did not contemplate such a search. *Scoggan v. State*, 736 S.W.2d 239, 244 (Tex.App.—Corpus Christi 1987), *rev'd on other grounds*, 799 S.W.2d 679 (Tex.Crim.App.1990). Six years after the Supreme Court's *Hayden* decision, Chapter 18 was amended. Article 18.02 was amended to list nine specific items for which a search warrant could be issued. These were:

(1) property acquired by theft or in any other manner which makes its acquisition a penal offense;

(2) property specially designed, made, or adapted for or commonly used in the commission of an offense;

(3) arms and munitions kept or prepared for the purpose of insurrection or riot;

(4) weapons prohibited by the Penal Code;

(5) gambling devices or equipment, altered gambling equipment, or gambling paraphernalia;

(6) obscene materials kept or prepared for commercial distribution or exhibition, subject to the additional rules set forth by law;

(7) drugs kept, prepared, or manufactured in violation of the laws of this state;

(8) any property the possession of which is prohibited by law;

(9) implements or instruments used in the commission of a crime.[4]

Each of these nine categories fits within the larger classifications of "fruits of crime, instrumentalities, and contraband." At the same time, Article 18.01 was changed to read:

(a) A 'search warrant' is a written order, issued by a magistrate and directed to a peace officer, commanding him to search for any property or thing and to seize the same and bring it before such magistrate.

(b) No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance. A sworn affidavit setting forth substantial facts establishing probable cause shall be filed in every instance in which a search warrant is requested.[5]

Although *Warden v. Hayden* had been decided six years earlier, no statutory provision yet addressed a search for "mere evidence." Even so, the courts began to follow *Hayden*. In 1972, the Court of Criminal Appeals held that officers who were searching a residence under the authority of a valid warrant to search for and seize marijuana could properly seize "mere evidence." *Phenix v. State*, 488 S.W.2d 759, 766–67 (Tex.Crim.App. 1972).[6] The Court held likewise in 1974. *See Chambers v. State*, 508 S.W.2d 348, 351–52 (Tex.Crim.App.1974).[7]

In 1977, the Legislature added a so-called "mere-evidence" provision to Article 18.02. TEX.CODE CRIM. PROC. ANN. art. 18.02(10) (Vernon Supp.1998); *Scoggan*, 736 S.W.2d at 244; *Joseph v. State*, 807 S.W.2d 303, 307 n. 4 (Tex.Crim.App.1991)(describing the provision as authorizing a search for "mere evidence"). Article 18.02(10) provided for the issuance of

3. Act of 1965, 59th Leg., R.S., ch. 722, 1965 Tex. Gen. Laws 317, 383.

4. Act of 1973, 63rd Leg., R.S., ch. 399, § 2(E), 1973 Tex. Gen. Laws 982.

5. Act of 1973, 63rd Leg, R.S., ch. 399, § 2(E), 1973 Tex. Gen. Laws 982.

6. The warrant authorized seizure of marihuana. Phenix objected to the seizure of a driver's license, a note, and an insurance company 'member's identification card' on the basis that they

were not mentioned in the warrant. The Court held that these items were properly seized under *Warden v. Hayden*.

7. The warrant authorized seizure of an M–2 rifle. Chambers objected to the seizure of a shotgun, expended shotgun shells, burned wallets, and a bloody blanket. Relying on *Warden v. Hayden* and *Phenix v. State*, the Court held that these items were properly seized.

a search warrant for "property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense." TEX. CODE CRIM. PROC. ANN. art. 18.02(10). However, this additional ground for issuance of a search warrant was limited by newly-added subdivisions (c) and (d) of Article 18.01. Subdivision (c) stated:

A search warrant may not be issued pursuant to Subdivision (10) of Article 18.02 of this code unless the sworn affidavit required by Subdivision (b) of this article sets forth sufficient facts to establish probable cause: (1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place or thing to be searched.[8]

*Id.* art. 18.01(a). Subdivision (d) placed further safeguards on what evidence could be seized, requiring that, "only the specifically described property or items set forth in a search warrant issued under Subdivision (10) of Article 18.02 of this code or property or items enumerated in subdivisions (1) through (9) of Article 18.02 of this code may be seized." *Id.* art. 18.01(d). Subsequent search warrants could not be issued under subdivision (10) of Article 18.02 to "search the same person, place, or thing subjected to a prior search under subdivision (10) of Article 18.02 of this code." [9]

As the statute now exists, search warrants issued under subdivision (10) must:

1. show more specific probable-cause, *i.e.*, the affidavit must establish:

(1) that a specific offense has been committed;

(2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense; and

(3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched (Article 18.01(c));

2. initially be issued only by a municipal court judge whose court is a court of record and who is an attorney, constitutional county judge who is an attorney, statutory county court judge, district judge, judge of the Court of Criminal Appeals, or justice of the Supreme Court (Article 18.01(c), (i));

3. not issue for "personal writings of the accused" (Article 18.02(10));

4. only authorize seizure of "specifically described property or items set forth in [the] warrant" (Article 18.01(d)); [10]

5. not issue for "mere evidence" located in the offices of businesses engaged in the electronic or print media, nor may items of "mere evidence" be seized in any such location under a warrant describing items enumerated in subdivisions (1) through (9) of Article 18.02 (Article 18.01(e)); and

6. not be issued more than once unless subsequent warrants are issued by a district judge, court of appeals justice, Court of Criminal Appeals judge, or Supreme Court justice (Article 18.01(d)).

Arguably the Legislature included the "personal writings" exception to protect persons from searches designed to find written evidence by which a person might incriminate himself. We have found no decision by the United States Supreme Court that discusses "personal writings" in this context,

8. Act of 1965, 59th Leg, R.S., ch. 722, 1965 Tex. Gen. Laws 317, 382, *amended by* Act of 1973, 63rd Leg, R.S., ch. 399, § 2(E), 1973 Tex. Gen. Laws 982; Act of 1977, 65th Leg., R.S., ch. 237, § 1, 1977 Tex. Gen. Laws 640. This provision appears to address the "nexus" requirement of *Warden v. Hayden*.

9. Act of 1965, 59th Leg, R.S., ch. 722, 1965 Tex. Gen. Laws 317, 383, *amended by* Act of 1973,

63rd Leg, R.S., ch. 399, § 2(E), 1973 Tex. Gen. Laws 982; Act of 1977, 65th Leg., R.S., ch. 237, § 1, 1977 Tex. Gen. Laws 640.

10. Because of the way subdivision (d) is worded, we conclude that "fruits, instrumentalities, and contraband" in plain view may always be seized by officers validly executing a search warrant.

nor can we locate any Texas decision that definitively discusses the "personal writings" exception contained in subdivision (10). *But see Bower v. State,* 769 S.W.2d 887, 905 (Tex. Crim.App.1989) (complaint concerning personal writings waived); *Nikrasch v. State,* 698 S.W.2d 443, 448 (Tex.App.—Dallas 1985, no pet.).[11]

■ Thus, it appears that the Legislature has adopted more restrictive rules for searches for "mere evidence" than those enunciated by the United States Supreme Court. Under our system of federalism, a state is free as a matter of its own law to impose greater restrictions on police activity than those the Supreme Court holds to be necessary upon federal constitutional standards. *Oregon v. Hass,* 420 U.S. 714, 718–20, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975) (*citing Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967); *Sibron v. New York,* 392 U.S. 40, 60–61, 88 S.Ct. 1889, 1901–02, 20 L.Ed.2d 917 (1968)).

The decisions of our appellate courts since the adoption of subdivision (10) have not been uniform. From a plain reading of the statute, one would conclude that the items to be seized must be identified with some particularity and that items of "mere evidence" not described at all may not be seized. TEX. CODE CRIM. PROC. ANN. arts. 18.01(d); 18.04(2). The intermediate courts have read the "safeguards" in Article 18.01(d) to always limit the seizure of "mere evidence" when the warrant was issued under Article 18.02(10) to those items specifically described in the warrant.[12] *See Ivatury v. State,* 792 S.W.2d 845, 850 (Tex.App.—Dallas 1990, pet. ref'd); *Scoggan v. State,* 736 S.W.2d at 244–45. However, it does not appear that the courts have read Article 18.01(d) to limit the seizure of "mere evidence" when the warrant was issued under subdivisions (1) through (9) of Article 18.02.

The Court of Criminal Appeals has twice since the addition of Articles 18.01(d) and 18.02(10) held that "mere evidence" can be properly seized under *Warden v. Hayden* when it is not specifically mentioned in the warrant. In *Joseph v. State,* decided in 1991, the Court held that a letter found in an envelope during a search under a warrant authorizing seizure of "a usable quantity of marijuana" was not properly seized because (1) looking inside the envelope exceeded the scope of the search authorized, as the officer testified that he knew he would not find marijuana there, and (2) the contents of the envelope were not in plain view. *Joseph,* 807 S.W.2d at 307–09. The Court observed, however:

> [W]e note that it is well settled that general exploratory searches are illegal. *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). A valid warrant based on probable cause is necessary to conduct a search unless one of the many exceptions to the warrant requirement is appropriate under the circumstances. In

11. *Nikrasch* states: "We have found no cases defining what 'personal writings' are under Article 18.02(10). However, following the guidance of *United States v. Doe,* 465 U.S. 605, 608–10, 104 S.Ct. 1237, 1240–42, 79 L.Ed.2d 552 (1984), which construed the fifth amendment privilege against compelled production of personal writings, we hold that personal writings under Article 18.02 are non-business writings only. While the lists in this case do not relate to any legitimate business, they do relate to appellant's illegitimate business of burglarizing safety deposit boxes. They are certainly not what one normally thinks of as non-business writings, that is, something on the order of diaries and personal letters. *See* 1 W. LAFAVE & J. ISRAEL, CRIMINAL PROCEDURE § 3.2(i) (1984)."

12. "When arts. 18.01 and 18.02 were amended in 1977 by Senate Bill 156, a bill analysis accompanying the committee report from the House Committee on Criminal Jurisprudence explained that the amendments expanded the current law relative to the issuance of search warrants by allowing a warrant to be issued for items constituting evidence of an offense. In expanding the scope of matters which could be procured by a search, the bill also provided a safeguard that only the items specified in the warrant could be seized. The bill analysis and the language of art. 18.01(d) make clear that when a search warrant is issued pursuant to art. 18.02(10), *only the items specified may be seized.* ... [P]olice generally have a right to seize items in plain view.... Arts. 18.01 and 18.02, however, statutorily limit this general rule where the warrant is issued to search for 'mere evidence' and the items discovered constitute 'mere evidence' outside the scope of the warrant." *Scoggan v. State,* 736 S.W.2d 239, 244–45 (Tex.App.—Corpus Christi, 1987), *rev'd on other grounds,* 799 S.W.2d 679 (Tex.Crim.App. 1990).

some instances "mere evidence" which is not specifically listed in the warrant may be discoverable. Mere evidence is evidence connected with a crime, but does not consist of fruits, instrumentalities, or contraband. *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Officers may seize mere evidence when the objects discovered and seized are reasonably related to the offense under investigation and the discovery is made in the course of a good faith search conducted within the parameters of a valid search warrant. *Id.* at 307–310, 87 S.Ct. at 1650–1652. The scope of a search, during which "mere evidence" may be found, is restricted to the object of the search and the places in which there is probable cause to believe it may be found. *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

*Id.* at 307. The Court did not attempt to reconcile this observation with the requirements of Article 18.01(d). In fact, the Court never mentioned the limitations of Article 18.01(d).

In *Bower*, a capital murder case decided in 1989, the Court, citing *Warden v. Hayden*, found no problem with officers' seizure of a large number of items which could not be said to be fruits, instrumentalities, or contraband and not listed in the search warrant, saying:

> An officer may seize mere evidence of a crime even though such property is not particularly described in the search warrant when the objects discovered and seized are reasonably related to the offense in question, when the officer at the time of the seizure has a reasonable basis for drawing a connection between the observed objects and the crime which furnished the basis for the search warrant, and the discovery of such property is made

in the course of a good faith search conducted within the perimeters of the search warrant. *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

*Bower*, 769 S.W.2d at 906; *but see Heitman v. State*, 815 S.W.2d 681, 685 (Tex.Crim.App. 1991). The Court acknowledged that the initial search warrant was issued under Article 18.02(10) and that the documents to be seized were not specifically described. However, no mention was made of the 18.01(d) requirement. So, no attempt was made to reconcile the more restrictive language of Article 18.01(d) with *Warden v. Hayden*. Furthermore, the Court held that items seized, which were not listed in the warrant, were properly seized because the officers were lawfully on the premises "under the warrant in connection with the investigation of the murders." *Id.* The Court held that it was reasonable for the officers to conclude that the additional items seized "had a relationship to the crime being investigated." *Id.* at 906. Thus, relying on *Warden v. Hayden*, the Court upheld the seizure of "mere evidence" under a warrant issued pursuant to Article 18.02(10) when that evidence was not listed in the warrant.

■ Our reading of Article 18.01(d) would limit the seizure of "mere evidence" both when the initial warrant was issued under Article 18.02(10) and when it was issued to seize items falling within subdivisions (1) through (9).[13] Thus, it is *always* necessary that "mere evidence" be specifically described before it may be seized under the authority of a warrant, even when that evidence was in plain view.[14] We recognize that other appellate courts have not read Article 18.01(d) to require a specific description of items of "mere evidence" when the warrant was issued under subdivisions (1) through (9). But even limiting the requirement to

13. See footnote 10.

14. The "plain view" rule generally allows officers to seize items in plain view when (1) they have a right to be where they are, (2) the evidence is inadvertently discovered, and (3) it is immediately apparent to them that they have evidence before them. *Scoggan*, 736 S.W.2d at 245. We agree with the Corpus Christi court that this rule has been statutorily modified as to

undescribed items when the warrant is one issued under subdivision (10) to search for "mere evidence." *Id.* Thus, we would also agree that "[i]f, in executing the warrant, officers discovered incriminating evidence, the legislature decided that it was appropriate for officers to return to the magistrate for a probable cause determination, rather than vest that determination with the officers making the search." *Id.*

warrants issued under subdivision (10), we cannot reconcile *Bower* with the statute, since the warrant in *Bower* was issued to search for and seize specifically-described "mere evidence." However, we are obligated to follow *Bower* in considering the merits of Reeves' contention.

■ Our obligation to follow *Bower* compels us to find that the evidence Reeves objected to was properly seized, although it was not listed in the warrant issued under Article 18.02(10) and although the items were "mere evidence" rather than fruits, instrumentalities, or contraband. *Bower*, 769 S.W.2d at 906. There is no dispute that the evidence was discovered and seized in the course of a good faith search conducted within the parameters of a valid search warrant. *Id.* Further, the evidence was reasonably related to the offense under investigation, and the officer seizing the evidence had a reasonable basis for drawing the connection between the evidence observed and the crime. *Id.*

The officers were lawfully on the premises under a warrant issued in connection with the investigation of Emelita's disappearance. They had knowledge of Reeves' relationship to the victim, and could reasonably conclude that marriage contracts, checks to a divorce attorney, "pen pal" letters, and personal ads for "companionship" would shed light on that relationship. Furthermore, in light of the fact that seizure of carpet samples was authorized, the check for carpet installation could reasonably be considered evidence that Reeves replaced the old carpet to dispose of incriminating evidence. It was reasonable for the officers to conclude that the additional items gathered had a reasonable relationship to the crime being investigated. *Id.*

■ Reeves mentions in passing that two of the items were "personal writings" and not subject to seizure because of the limitation of Article 18.02(10). We have reviewed his motions and objections in the trial court and find that he did not preserve this complaint for appellate review. TEX. R.APP. P. 33.1(a).

Even if it had been preserved, we would overrule the contention. First, we are not convinced that a "form letter" or an advertisement to be placed in a magazine are "personal writings." We believe that the term "personal writings" was intended to refer to writings like diaries, memos, and journals that were not intended by the writer to be published to third parties. Second, we would find that, because the warrant did not authorize their seizure, Article 18.02(10) was not violated. If under *Bower* undescribed items constituting "mere evidence" can be seized notwithstanding the provisions of Article 18.01(d), we see no reason why these items could not also be seized.

We overrule Reeves' eighth and ninth points.

## THE TRANSFER OF EVIDENCE

In point five, Reeves complains that the court erred in admitting evidence seized under a Tarrant County warrant, when the transfer of that evidence to Bosque County was not authorized by Article 18.10 of the Code of Criminal Procedure. Article 18.10 provides in part that property may not be removed from the county in which it was seized without an order approving removal, issued by a magistrate in the county in which the warrant was issued. *See* TEX.CODE CRIM. PROC. ANN. art. 18.10 (Vernon Supp.1998). Exceptions exist for forwarding the evidence to a laboratory for scientific analysis. *Id.* Because no order was issued in Tarrant County, Reeves maintains that the evidence should have been excluded under Article 38.23 of the Code of Criminal Procedure.

■ The State concedes that "obtaining such an order might have been the better course," but urges that Article 38.23 is not applicable when previously seized evidence is transferred for the purpose of using it during the accused's trial. We agree. Although the State should have complied with Article 18.10 in removing the evidence from Tarrant County, the consequences Reeves seeks are not mandated by Article 38.23.[15] Article 38.23 provides:

Whatever the remedy may be, it is not found within the purview of Article 38.23.

---

15. We do not attempt to ascertain what the appropriate remedy would be for a violation of Article 18.10. Perhaps there is no remedy at all.

### Art. 38.23. Evidence not to be used

(a) No evidence *obtained* by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

(b) It is an exception to the provisions of Subsection (a) of this Article that the evidence was obtained by a law enforcement officer acting in objective good faith reliance upon a warrant issued by a neutral magistrate based on probable cause.

*Id.* art. 38.23 (Vernon Supp.1998) (emphasis added).

■ The word "obtained" is not defined in the statute. In the absence of a statutory definition, statutory language is measured by common understanding and practices. *Ely v. State,* 582 S.W.2d 416, 419 (Tex.Crim.App. 1979); *Carroll v. State,* 911 S.W.2d 210, 220 (Tex.App.—Austin 1995, no pet.). "Obtain" means "to get hold of by effort; to get possession of; to procure; to acquire...." *Carroll,* 911 S.W.2d at 220 (*citing Black's Law Dictionary* 1078 (6th Ed.1990)). In *State v. Daugherty* the Court of Criminal Appeals held that Article 38.23 excludes evidence "obtained" in violation of the law, and "obtain" means to gain or attain by planned action or effort. *State v. Daugherty,* 931 S.W.2d 268, 270–71 (Tex.Crim.App.1996). In this case, the State already had custody of the evidence; thus, no effort was necessary "to get hold of" the evidence.

■ The violation of just any law does not invoke the provisions of Article 38.23. *Carroll,* 911 S.W.2d at 221. Article 38.23(a) may not be invoked for statutory violations unrelated to the purpose of the exclusionary rule. *Lane v. State,* 951 S.W.2d 242, 243 (Tex.App.—Austin 1997, no pet. h.); *see also*

*Roy v. State,* 608 S.W.2d 645, 651 (Tex.Crim. App.1980)(where an undercover officer violated the Assumed Name Statute, suppression under 38.23 was not necessary). For example, violations of the Code of Professional Responsibility do not constitute a violation of the law within the meaning of the exclusionary rule. *See Pannell v. State,* 666 S.W.2d 96, 98 (Tex.Crim.App.1984). Other courts have held Article 38.23 inapplicable when violations have occurred regarding the Health and Safety Code and the Education Code. *See Fisher v. State,* 839 S.W.2d 463, 469 (Tex.App.—Dallas 1992, no pet.); *Stockton v. State,* 756 S.W.2d 873, 874 (Tex.App.—Austin 1988, no pet.).

We hold that the evidence taken from Tarrant County to Bosque County for court proceedings was not "obtained" in violation of any law within the meaning of Article 38.23. Thus, the exclusion of this evidence was not mandated, and the court was within its discretion when it admitted the evidence. Accordingly, point five is overruled.

### LESSER–INCLUDED OFFENSES

■ Reeves' sixth point urges that he was entitled to jury instructions regarding the lesser-included offenses of manslaughter and criminally negligent homicide. It is undisputed that the exact cause of death could not be established. However, through circumstantial evidence, the State attempted to prove Reeves had the requisite intent to commit murder. Basically, through seventy-plus witnesses, the State tried to show that the circumstances surrounding Emelita's disappearance, as well as Reeves' behavior both before and after her disappearance, showed that he was responsible for her death and that her murder had been carried out in an intentional manner. The only evidence to which Reeves points in asserting that the lesser offenses were raised is the testimony of two experts, one a forensic pathologist, the other a forensic anthropologist, who testified regarding the manner and means of Emelita's death. Both believed she died as a result of criminal homicide, but neither could say whether her death was caused intentionally or not.

Dr. Marc Krouse testified that he examined the skeletal remains to determine if the body found was actually that of Emelita Reeves, and to determine the manner and cause of her death. He explained that the "cause of death" is the "actual condition which resulted in death." The "manner of death" indicates "whether death occurred from natural causes, accident, suicide, homicide, or undeterminable." Krouse testified that in his opinion, considering the circumstances in which the body was found, Emelita's death was a homicide, but he could not make a guess as to the cause of death. He defined homicide as "the death of one individual caused by the actions or inactions of another individual that have either been directed or involve gross negligence." Dr. Harold Gil–King gave similar testimony.

 In determining whether a jury must be instructed concerning a lesser-included offense, a twostep analysis must be applied. *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex.Crim.App.1993). First, the lesser-included offense must be included within the proof necessary to establish the offense charged. *Id.* Second, there must be some evidence in the record that would permit a rational jury to find that if the defendant is guilty, he is guilty of only the lesser offense. *Id.* (clarifying the test of *Royster v. State*, 622 S.W.2d 442, 446 (Tex.Crim.App.1981)). Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. *Bignall v. State* 887 S.W.2d 21, 23 (Tex.Crim.App.1994). However, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesserincluded offense is warranted. *Id.* at 24; *Skinner v. State*, 956 S.W.2d 532, 543 (Tex.Crim.App.1997).

 If evidence from any source raises the issue of a lesser-included offense, an instruction on that offense must be included in the court's charge. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex.Crim.App.1992). If a defendant either presents evidence that he committed no offense or presents no evidence, and there is no evidence otherwise showing he is guilty only of a lesserincluded offense, then a charge on a lesser-included offense is not required. *Bignall*, 887 S.W.2d at 24; *Jones v. State*, 921 S.W.2d 361, 364 (Tex.App.—Houston [1st Dist.] 1996, pet. ref'd). There are two ways in which the evidence may indicate a defendant is guilty of only a lesser offense. There may be evidence which negates or refutes other evidence establishing the greater offense; or, the evidence presented may be subject to different interpretations and one of those interpretations must negate or rebut an element of the greater offense. *Saunders*, 840 S.W.2d at 391–92. Reeves relies on this second way of raising a lesser offense in claiming he was entitled to the jury instructions.

 A person commits criminal homicide if he intentionally, knowingly, recklessly, or with criminal negligence causes the death of an individual. TEX. PEN.CODE ANN. § 19.01(a) (Vernon 1994). A person is guilty of murder—as opposed to the other forms of criminal homicide—if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *Id.* § 19.02(b)(1)(2) (Vernon 1994). For Reeves to be entitled to a jury charge on either manslaughter or criminally negligent homicide, the record must include some evidence indicating that he caused Emelita's death but did not *intend* to cause either her death or serious bodily injury. *Skinner*, 956 S.W.2d at 543; *Burnett v. State*, 865 S.W.2d 223, 229 (Tex.App.—San Antonio 1993, pet. ref'd).

 Although it is true that a lesser-included offense may be raised when the evidence on the issue is subject to two different interpretations, it is fundamental that the second interpretation must negate or rebut an element of the greater offense suggested by the first interpretation. *See Schweinle v. State*, 915 S.W.2d 17, 19 (Tex.Crim.App. 1996)(per curiam). This was not the result of the testimony from either of the State's experts. The evidence Reeves relies on does not suggest he was guilty of an offense less

than murder; specifically, it does not suggest that he did not intend to cause death or serious bodily injury. Thus, he was not entitled to a jury instruction regarding the lesser offenses of manslaughter and criminally negligent homicide. Point six is overruled.

## OUT–OF–COURT STATEMENTS

### WATCH OUT FOR THAT HOLE!

Reeves' seventh point asserts that the court erred in admitting testimony concerning comments by and conduct of his four-year-old son, Kendall, which allowed the jury to infer Kendall's familiarity with Emelita's grave site, thereby leading to an inference that Reeves had taken him there (and a further inference that Reeves had taken him there when he buried Emelita). He complains that the testimony was inadmissable both as hearsay and as irrelevant under Rules 401, 402, and 403. TEX.R.CRIM. EVID. 401, 402, 403.

At trial, Officer Buddy Evans testified that he and others, along with a child therapist, accompanied Kendall Reeves to the site where Emelita's body was found. He testified that Kendall ran ahead of the group as if familiar with the area and warned them of an upcoming hole in the ground. Evidence was offered that no such hole was observable at the time Kendall gave the warning, but did become so soon afterwards. Reeves objected to the admission of this testimony as hearsay, and the State responded that it fit within an exception to hearsay, specifically citing the "excited utterance" and the "present sense impression" exceptions to the hearsay rule. *See id.* 801, 802, 803.

■ Hearsay is a statement, including a written statement, other than one made by the declarant while testifying at the trial, which is offered to prove the truth of the matter asserted. *Id.* 801(d); *Schaffer v. State,* 777 S.W.2d 111, 113 (Tex.Crim.App. 1989); *Barnard v. State,* 730 S.W.2d 703, 723 (Tex.Crim.App.1987). An extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the truth of the matter stated therein does not constitute hearsay. *Dinkins v. State,* 894 S.W.2d 330, 347 (Tex.Crim.App.

1995); *Crane v. State,* 786 S.W.2d 338, 351 (Tex.Crim.App.1990); *Porter v. State,* 623 S.W.2d 374, 385 (Tex.Crim.App.1981). In *Gholson v. State,* the Court stated that "[a]n extra-judicial statement or writing may be admitted as circumstantial evidence from which an inference may be drawn, and not for the truth of the matter stated therein, without violating the hearsay rule." *Gholson v. State,* 542 S.W.2d 395, 398 (Tex.Crim. App.1976).

■ Because this testimony was not offered for the truth of the matter asserted, but rather was offered as circumstantial evidence from which the jury could infer his familiarity with the area, the testimony is not hearsay and was not objectionable on that basis. *Id.* However, Reeves also objected to the admission of this evidence on relevancy grounds, which were likewise overruled.

■ Rule 401 of the Rules of Criminal Evidence defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX.R.CRIM. EVID. 401. The trial court has no discretion to admit irrelevant evidence. *Id.* 402; *Montgomery v. State,* 810 S.W.2d 372, 387 (Tex.Crim.App. 1990) (opinion on reh'g). As long as the trial court operates within the boundaries of its discretion, we will not disturb its decision. *Montgomery,* 810 S.W.2d at 390. In reviewing whether a trial judge has abused his discretion, we must determine if the "trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App.1992); *Kelly v. State,* 824 S.W.2d 568, 574 (Tex. Crim.App.1992). Thus, we will not disturb the court's decision as long as it lies "within the zone of reasonable disagreement." *Green v. State,* 934 S.W.2d 92, 101–2 (Tex. Crim.App.1996); *Montgomery,* 810 S.W.2d at 391. Where the circumstances indicate that the trial judge's decision is beyond the "zone of reasonable disagreement," we will not hesitate to find an abuse of discretion. *Heiselbetz v. State,* 906 S.W.2d 500, 517 (Tex.Crim. App.1995).

The State urges that this testimony had relevance because "it showed knowledge on the part of the declarant [Kendall] that he could have gained only by having observed the hole at a prior time." The State urges that the question of whether Kendall had been at the location before was relevant because "the jury was permitted to infer that his youngest son had been there with Appellant, most probably when the child's mother's body was left there." We are not persuaded that these inferences built upon inferences are probative of whether Reeves buried Emelita there. However, we cannot say this evidence has no tendency to make it more probable than not that Reeves had been there before.

■■■ First, we must assume Kendall was unable to see the hole when he warned the others to look out for it. Officer Evans testified that "sometimes in a new surrounding or foreign surrounding a young child would not want to stray off too far from the people that had custody of him, whereas in Kendall's case he immediately took off going off everywhere, talking, . . . ." The purpose of this comment was to show Kendall's familiarity with the area, although it leaves open the question of whether Kendall was able to see the hole before anyone else could because he was running ahead of the group. Second, we must infer, assuming he had not seen the hole on this particular day, that Kendall had seen it on a previous occasion. Third, we must assume that Reeves was with him when Kendall saw the hole on a previous occasion. Finally, we must infer that Reeves buried Emelita's body on this previous occasion. We find this evidence to be wholly unreliable because of its inherent tendency to confuse the issues.

Rule 403 of the Rules of Criminal Evidence provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Tex.R.Crim. Evid. 403. In determining whether to exclude evidence under Rule 403:

. . . the trial judge should consider the inherent tendency that some evidence may have to encourage resolution of material issues on an inappropriate basis and should balance carefully against it the host of factors affecting probativeness, including relative weight of the evidence and the degree to which its proponent might be disadvantaged without it.

*Fuller v. State,* 829 S.W.2d 191, 206 (Tex. Crim.App.1992). Because this evidence deserves little if any weight with regard to showing Reeves' familiarity with Emelita's grave site, the State would not have been disadvantaged without it. On the other hand, asking the jury to consider such weak testimony as evidence of a crucial point created potential for the jury to be misled and to confuse the real issues in question.

■■■ Confusion of the issues occurs when introduction of the contested evidence raises "the probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues." *Smith v. State,* 959 S.W.2d 1, 1997 WL 195290, *11 (Tex. App.—Waco 1997, no pet. h.) (*citing* 1 STEVEN GOODE ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 403.2 (Texas Practice 1993)). Generally, we presume that the probative value of the evidence exceeds the dangers considered by Rule 403. *See McFarland v. State,* 845 S.W.2d 824, 837 (Tex.Crim. App.1992). However, considering the lack of probative value of this evidence, the likelihood that the jury was distracted by the idea that Reeves took his four year old child to watch his mother's body be buried in some remote wooded area cannot be ignored. Because this testimony had a tendency to mislead the jury and confuse the issues, we believe the court acted outside the zone of reasonable disagreement in admitting it. *See Bigby v. State,* 892 S.W.2d 864, 883 (Tex. Crim.App.1994). Thus, we find the court erred in admitting this testimony.

■■■ Finding error, we now must determine whether Reeves was harmed. This is non-constitutional error governed by Rule of Appellate Procedure 44.2(b). *See* TEX.

R.App. P. 44.2(b); *Fowler v. State*, 958 S.W.2d 853, 864–66 (Tex.App.—Waco 1997, pet. granted). In considering harm, the entire record must be reviewed to determine whether the error had more than a slight influence on the verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997) (citing *Kotteakos v. U.S.*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *Fowler*, 958 S.W.2d at 864–66. If we find that it did, we must conclude that the error affected the defendant's substantial rights in such a way as to require a new trial. *Id.* Also, if we have grave doubts about the error's effect on the outcome, we must remand for a new trial. *Id.* Otherwise, we should disregard the error. *Id.* The extent of the exchange regarding Kendall's knowledge of the area was as follows:

Q: Did he [Kendall] go down that incline toward the creek?

A: Yes.

Q: And did you follow him in that—in that regard, as well?

A: Yes.

Q: As you were going down that incline, did he warn you?

. . .

A: Yes.

Q: And what did he say when he warned you?

A: He said, "Look out for the hole."

Q: All right. When—when he said that to you could you see a hole?

A: I couldn't see a hole.

Q: All right.

A: And nobody else in our group could see a hole.

Q: And then did you continue on down that incline?

A: Yes.

Q: And as you passed further down the incline what did you see?

A: A substantial hole, large hole.

In considering all of the evidence against Reeves as was previously detailed, we cannot say that this evidence was of such character as to have more than a slight influence on the jury. *Id.* On cross-examination, Reeves' attorney emphasized that the hole to which Kendall was referring was on the opposite side of the street from where Emelita's body was found. Furthermore, the jury was aware that Kendall had been camping at Lake Whitney many times with his parents. Even assuming that the evidence gave rise to an inference that Kendall had been there before, it did not lead the jury to conclude that the previous visit had anything to do with Emelita's death. Point seven is overruled.

**THE HEAD NOD**

In points three and four, Reeves complains that the court erred in admitting testimony that he nodded his head during a bond hearing in response to testimony regarding the location of Emelita's remains. He claims that, because he was communicating with his attorney when this supposed "head nod" took place, using it against him violates his State and Federal Constitutional rights. He also complains that allowing such use, considering the ambiguous nature of the head nod, "chills" attorney-client communication. Finally, Reeves urges that the court abused its discretion in allowing this testimony because its probative value was significantly outweighed by the prejudicial effect.

 Detective Tom Lenoir with the Arlington Police Department testified at trial. He stated that he had been a witness in another proceeding in Coryell County involving "another matter," and that he testified regarding the relative locations of the camp site known to be visited by Reeves and the place where Emelita's body was found. He observed Reeves while testifying at this previous proceeding, and testified during the trial for Emelita's murder about what he observed. The evidence in dispute is as follows:

Q: Did you observe a reaction from the accused that you thought was significant?

A: I observed two reactions and one caught my attention, which basically had me observe the second reaction.

Q: Talk about the first one.

. . .

A: The first reaction was when they asked me a correlation between the two sites. I said it was approximately two miles. I was basically saying— as a matter of fact, Mr. Ball commented as the crow flies, but when I said two miles, the Defendant became visibly upset. He was speaking to his attorney. He was moving in his chair. That was when Mr. Ball I believe objected and said as the crow flies can you tell us specifically. I gave the mileage, seventeen point eight miles. I was looking directly at the Defendant. He was acknowledging yes.

Q: He was looking at you?

A: He was looking directly at me.

Q: He wasn't communicating with anybody?

A: He was looking directly at me.

. . .

Q: Mr. Reeves was looking directly at you, you were looking directly at him and he acknowledged?

A: Yes, sir.

Q: With a nod of the head affirming?

A: That is correct.

Reeves' attorney testified outside the presence of the jury. He stated that he had asked Reeves whether he owned a boat and that Reeves answered negatively. Because the testimony was that Reeves was nodding his head in the affirmative, the trial court disregarded the concern that his head nod was in response to something asked by his attorney.

Reeves argues that this was an interception of attorney-client communications for the benefit of law enforcement, which violates a defendant's right to counsel under the Sixth Amendment of the United States Constitution and Article 1, Section 10 of the Texas Constitution. In support of this proposition, he cites *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), and *Ott v. State*, 627 S.W.2d 218 (Tex.App.— Fort Worth 1981, pet. ref'd). We do not believe these cases support the proposition

asserted by Reeves. In *Ott*, the appellant was complaining about the seizure of notes. He urged that his right to counsel under the Federal and State Constitutions was violated because the attorney-client privilege was violated and because his right to effective assistance of counsel was infringed. The court stated that this was not a situation "where the accused's right to consult and confer in private with his attorney was violated, or where the government, by surreptitious means, either through electronic surveillance between attorney and client, or by placing an informant in a position to learn defense strategy, intruded into the confidentiality and privacy between lawyer and client." *Ott*, 627 S.W.2d at 224. The Fort Worth Court stated:

> Appellant would have this court compare this case to such cases as *U.S. v. Levy*, 577 F.2d 200 (3rd Cir.1978); *U.S. v. Zarzour*, 432 F.2d 1 (5th Cir.1970); and *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), which hold in general that the right to counsel is violated when law enforcement officers knowingly intercept confidential attorney-client communications and disclose these to the prosecution. The holdings in *Levy* and *Zarzour* turn on whether or not the intrusion was unlawful and for the sole purpose of determining defense strategy. That is just not the situation here.

*Id.*

As in *Ott*, we do not have a situation where information was obtained through intrusive means with the sole intent of intercepting confidential communications. The testimony indicated that Reeves looked directly at the officer, who was testifying, and nodded. There was no information intercepted. There was no information which could benefit law enforcement. Communications with Reeves' attorney were not used against him. *Id.* Thus, Reeves' rights under neither the United States Constitution nor the Texas Constitution were violated.

 He further complains that any probative value is outweighed by the prejudicial effect. TEX.R.CRIM. EVID. 403. We agree that evidence that Reeves nodded his head at a time when Officer Lenoir was reciting dis-

tances is probative of nothing, and in fact, has little relevance. Because this testimony likewise had a tendency to mislead the jury and confuse the issues, we believe the court's ruling in admitting the testimony was outside the zone of reasonable disagreement. *Bigby*, 892 S.W.2d at 883. Thus, error occurred.

We also believe, however, that the testimony had little prejudicial effect. Tex. R.App. P. 44.2(b). Through competent cross-examination, Reeves' attorney explained that (1) a map detailing the location of Emelita's remains had been publicized in the Star-Telegram, thus it proved nothing if Reeves had some familiarity with that location, and (2) he and Reeves were conferring during Lenoir's testimony regarding the distances and that Reeves' actions could have been in response to something said by his attorney.

In closing argument, the State posed the question, "how would he know the distance of seventeen point eight miles between his last campsite and where the remains were found?" Although this does ask the jury to infer that he was aware of this distance, in light of the other inferences which could be drawn from the action, and in light of the State's entire case against Reeves, we do not believe this evidence had more than a slight influence on the jury. Thus, any error in admitting this evidence must be disregarded. *See id.*; *King*, 953 S.W.2d at 271; *Fowler*, 958 S.W.2d at 864–66. Points three and four are overruled.

## COMMENT ON INVOCATION OF CONSTITUTION RIGHTS

In his first two points, Reeves complains that the court admitted evidence that he refused to consent to a search of his home when the officers had no probable cause to proceed with such a search. He urges that this was a violation of his Fourth Amendment right to be free from unreasonable searches as well as a violation of Article 1, Section 9 of the Texas Constitution. The question of whether the admission of this testimony is error has rarely been considered by Texas courts. However, the magnitude of the harm from admitting such evidence has not been considered at all. After a thorough review of not only Texas law concerning this question, but cases from other jurisdictions as well, we find that admitting this testimony was error of constitutional magnitude.

After receiving a phone call concerning Emelita's possible disappearance, the Arlington police went to Reeves' home. The officers requested consent to enter the home to look for Emelita, but Reeves refused. The State asked questions about this exchange and elaborated on it during closing argument. "Three times they ask permission to go inside the house just to make sure that Emelita is all right, if she's in the house. Three times they are refused."

In support of his argument, Reeves relies on an El Paso case, *Powell v. State*, which establishes the proposition that such evidence is inadmissible in Texas courts. *Powell v. State*, 660 S.W.2d 842 (Tex.App.—El Paso 1983, no pet.) In *Powell*, employees of Continental Airlines in Los Angeles, California, received a package to be shipped to Midland, Texas. Believing the package to be suspicious, they opened it and discovered 180 pills with a note indicating the quantity and value. The Los Angeles Police Department (LAPD) was contacted, and a narcotics officer identified the pills as Dilaudid, a controlled substance. The package was resealed and sent to Powell in Midland. LAPD contacted the Midland Police Department, which obtained a search warrant. After signing for the package, Powell was approached by the Midland police. When officers asked permission to inspect the package, Powell refused. The Court held that allowing testimony that she would not permit the officers to inspect the package voluntarily was error, stating, "Whether this is viewed as testimony concerning her verbal responses while in custody or her physical action, it was improper. The invocation of constitutional rights such as assistance of counsel, silence, or freedom from unreasonable searches may not be relied upon as evidence of guilt. To permit the use of such evidence for purposes of incrimination would erode the protections guaranteed by both state and federal constitutions." *Id.* at 845 (citing *Stafford v. State*, 578 S.W.2d 394 (Tex.Crim.App.1978)).

The State argues that *Powell* is not dispositive because Reeves' statement was not made while in custody and was not protected by the Fifth Amendment. It contends that the rule articulated in *Powell* was applied where the defendant refused consent *while in custody*, whereas Reeves was not in custody at the time he refused to give consent. An identical argument was made in *Ex parte Owens*, and the Austin Court commented generally that the rule articulated in *Powell* may not be so broad as to encompass noncustodial refusals. *Ex parte Owens*, 860 S.W.2d 727, 731 (Tex.App.—Austin, 1993, pet.ref'd). However, the issue presented in *Owens* was quite different from that in *Powell*.

In *Owens*, the Austin Court considered an ineffective assistance of counsel claim when the defense attorney failed to object to testimony regarding refusal to consent to a search. *Id.* at 729–31. While stating that it had a tendency to agree with the rule as stated in *Powell*, the Austin Court refused to hold failure to object to such evidence as ineffective, stating, "that a defendant's refusal to consent to search may not be used as evidence of guilt, however logical it may seem in hindsight, is not a proposition that can be considered well established in state or federal law; nor is it so basic and fundamental a proposition as to compel the conclusion that any counsel who fails to perceive it is not functioning effectively as the counsel constitutionally guaranteed to a criminal defendant." [16] *Id.* at 730.

Contradicting *Owens*, the Corpus Christi Court held in *Winn v. State* that counsel's performance was deficient when he failed to object to testimony that Winn refused to consent to a search of his trailer and when he introduced a videotape into evidence in which Winn invoked his right to counsel. *Winn v. State*, 871 S.W.2d 756, 763–64 (Tex.App.—Corpus Christi 1993, no pet.). Citing *Powell*, the court held that the use of such evidence erodes the protections guaranteed by the state and federal constitutions. *Id.*

In *Cacy v. State*, the El Paso Court again considered the admission of the accused's invocation of her right to counsel and her right to refuse to consent to a search. *Cacy v. State*, 901 S.W.2d 691 (Tex.App.—El Paso 1995, pet. ref'd). Cacy was convicted of murder by starting a fire in which the victim died. The jury heard testimony that she told an officer that "she wasn't giving [police] a fucking thing until she spoke [to] her attorney." Another witness stated that when asked to consent to a blood sample, Cacy said, "Hell no, not without my attorney." The refusal to cooperate was a focal point in the State's closing argument. Cacy's attorney failed to object to the admission of any of this testimony, thereby waiving the complaint. However, Cacy argued that the error was fundamental and therefore reviewable. The Court determined that *Powell* had not addressed whether admitting evidence of the invocation of a constitutional protection constitutes fundamental error. It ultimately concluded that such an error is not fundamental and overruled Cacy's complaint. *Id.* at 699.

Texas law being limited on the subject, we turn to other authority for guidance. In *United States v. Prescott*, the Ninth Circuit persuasively addressed this issue, focusing on the sanctity of the home. *United States v. Prescott*, 581 F.2d 1343, 1350–51 (9th Cir. 1978). The Court stated that "physical entry

---

**16.** The Austin Court recognized other jurisdictions which have adopted the rationale in *Powell* as persuasive authority for Texas to adopt a similar rule. *See Commonwealth v. Welch*, 401 Pa.Super. 393, 585 A.2d 517 (1991); *Garcia v. State*, 103 N.M. 713, 712 P.2d 1375 (1986); *Gomez v. State*, 572 So.2d 952 (Fla.Dist.Ct.App. 1990) (defendant's refusal to consent could not lead to an inference of guilt *because there was no probable cause to search at the time defendant refused consent*).

In *Anable v. Ford*, the court held that "a refusal to consent to a search cannot lead to an inference of guilt unless the search is initially authorized by the Fourth Amendment. Obviously where a search is not justified, refusal to allow it supports no inference at all, just as a refusal to give a statement in a criminal case cannot be considered as evidence of guilt of an accused." *Anable v. Ford*, 653 F.Supp. 22, 36 (W.D.Ark. 1985).

But see *U.S. v. McNatt*, where the court held that the government's argument that appellant refused to consent to a search of his vehicle was proper when it was not argued to support an inference of guilt, but rather was argued in rebuttal to his defense that the evidence was planted. 931 F.2d 251, 257 (4th Cir.1991).

of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 1349. Prescott asked for an instruction that her failure to consent was not a crime and could not be used against her. This instruction was refused. The court held it was prejudicial error to permit the government to prove that Prescott declined to unlock her door when officers did not have a warrant because *it is a constitutional right not to consent to a warrantless entry.* The Court stated:

> "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search." *Bumper v. North Carolina,* 1968, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797. When, on the other hand, the officer demands entry but presents no warrant, there is a presumption that the officer has no right to enter, because it is only in certain carefully defined circumstances that lack of a warrant is excused. *Camara v. Municipal Court,* 1967, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930. An occupant can act on that presumption and refuse admission. He need not try to ascertain whether, in a particular case, the absence of a warrant is excused. He is not required to surrender his Fourth Amendment protection on the say so of the officer. The Amendment gives him a constitutional right to refuse to consent to entry and search. His asserting it cannot be a crime, *Camara, supra,* 387 U.S. at 532–33, 87 S.Ct. 1727, 1732–33, 18 L.Ed.2d 930. *Nor can it be evidence of a crime....*

*Prescott,* 581 F.2d at 1350–51 (emphasis added). Use by the prosecutor of the refusal of entry can have but one objective—to induce the jury to infer guilt. *Id.* at 1352. Because the right to refuse entry is equally available to the innocent and the guilty, the refusal is as "ambiguous" as silence which is maintained as a right under the Fifth Amendment. *Id.* To allow the use of one's refusal to consent to entry into his home without a warrant would be to impose a penalty for exercising a constitutional right. *Id.* Allowing evidence of Reeves' refusal to consent to a warrantless search of his home was error. *See id.* at 1350; *Powell,* 660 S.W.2d at 845.

### HARM

Finding that use of one's refusal to consent to a warrantless entry is error, we must now address whether the harm resulting from that error should be analyzed as "constitutional." The new Rules of Appellate Procedure distinguish how we determine harm that results from constitutional error and "other errors." *Fowler,* 958 S.W.2d at 864. We must determine if admitting this evidence was a violation of constitutional safeguards, as urged by Reeves, or merely a violation of evidentiary rules, namely Rules 401, 402, and 403 of the Rules of Criminal Evidence, as urged by the State. Previous Texas cases addressing this issue have addressed harm under former Rule 81(b)(2), which provided the single test of harm for all errors.

 We first clarify that we are dealing with an invocation of one's right to be free from unreasonable searches while not in custody. This is solely a Fourth Amendment issue, and not one which implicates the Fifth Amendment. However, we do recognize a similarity in the magnitude of harm which may result from allowing the invocation of any right to be used as evidence of guilt. In *Prescott,* the Court analogized the result of using one's right to be free from unreasonable searches to situations in which one's refusal to waive Fifth Amendment rights was used to infer guilt. The Court observed that admitting evidence of a defendant's refusal to consent to entry into her home without a warrant imposes a penalty for exercising a constitutional privilege and lessens the privilege by making its assertion costly.[17] *Prescott,* 581 F.2d at 1352. Thus, we find this error is of constitutional magnitude.

---

17. Invoking this right is similar to invoking the Fifth Amendment. "Just as a criminal suspect may validly invoke his Fifth Amendment privilege in an effort to shield himself from criminal liability, so one may withhold consent to a warrantless search, even though one's purpose be to conceal evidence of wrongdoing." *Prescott,* 581 F.2d 1343, 1351 (9th Cir.1978) (citations omitted).

## RULE 44.2(a)

Considering the error to be constitutional in nature, we look to *Hardie v. State*, the only Court of Criminal Appeals case we have found which considered the harm which results when one's refusal to waive a right is used to infer guilt. *Hardie v. State*, 807 S.W.2d 319 (Tex.Crim.App.1991). In *Hardie*, the appellant was arrested for DWI. While on *video*, the police asked him to submit to an intoxilyzer, and he responded that he would have to wait until either his mother or his lawyer arrived. The officer refused to wait and again asked him to submit. Hardie responded that he needed to be told what to do by either his mother or his lawyer, and stated that he did not know what his rights were. The officers then asked him to answer a few questions. He did so, and gave incriminating responses. All of this was captured on videotape and played for the jury.

The Court of Criminal Appeals held that "evidence of an accused invoking his or her right to counsel may indeed be construed adversely to a defendant and may improperly be considered as an inference of guilt." *Id.* at 322. "Such adverse use of evidence that a defendant invoked a right or privilege which has been granted him, is constitutionally impermissible." *Id.* (*citing Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)). The Court went on to hold that "evidence of one's invocation of the right to counsel is inadmissible as evidence of guilt," overruling any previous language which could be construed to the contrary. *Id.*

*Hardie* is helpful because it approved the harm analysis used by the court of appeals in determining that the error required reversal. This analysis was done under former Rule 81(b)(2), which required reversal unless it could be determined that the error did not contribute to the conviction or punishment, the same test that we now use for assessing harm flowing from constitutional error. *See* Tex.R.App. P. 81(b)(2)(repealed); Tex.R.App. P. 44.2(a). The Court approved a determination that, because the jury sent a note asking whether the defense counsel had seen the video prior to trial *after* it had sent a note indicating it had reached an impasse, it could not be concluded that the jury would have

reached the same verdict had they not heard the audio portion of the videotape. Thus, it could not be said beyond a reasonable doubt that the error did not contribute to the verdict.

We have no indication that the jury relied on Reeves' refusal to consent to entry into his home as evidence of guilt. To the contrary, we believe that there is sufficient evidence to determine beyond a reasonable doubt that this error did not contribute to the verdict. There was evidence that Reeves consented to a search of his home the very next day (via his son, Randall). Testimony of the officers who asked for consent was contradictory. One officer said they asked to enter three times, while the other said they only asked once. One said Reeves refused, while the other said he stated, "I've already told you she's not here." This is all testimony which, taken together, made it unlikely that any unfavorable inferences were made by the jury.

Under new Rule 44.2(a), we follow the same steps used in *Hardie* in determining harm when it stems from constitutional error: we (1) isolate the error and all of its effects and (2) ask whether a rational trier of fact might have reached a different result if the error and its effects had not occurred. *Harris v. State*, 790 S.W.2d 568, 588 (Tex.Crim.App.1989). In making this determination, we examine the source and nature of the error, the State's emphasis of the error, the probable collateral implications, the weight probably placed upon the error, and whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.* at 587–88; *Williams v. State*, 916 S.W.2d 53, 56 (Tex.App.—Houston [1st Dist] 1996, no pet.).

We have already established the source and nature of the error. The State did refer to the inadmissible testimony in closing argument, however, we do not believe that declaring this error harmless would encourage the State to repeat it with impunity. There is no evidence of police misconduct. *See Williams*, 916 S.W.2d at 56. The State's conduct was not intended to circumvent trial court procedure. *See id.* It was the trial

court's erroneous ruling that allowed the testimony and argument, not the State's conduct. Finally, we do not believe that the jury placed significant weight on this evidence. Considering the overwhelming evidence against Reeves, we cannot conclude that the factfinder would have reached a different result without the effects of the error. The probable impact of the evidence on jury deliberations was minimal. *Id.*

This is a difficult question. After a thorough review, however, we conclude beyond a reasonable doubt that the references to his refusal to allow the police into his home did not contribute to the verdict. *See* TEX.R.APP. P. 44.2(a). Points one and two are overruled.

Having overruled all points, the judgment is affirmed.