

# NUMBER 13-11-00111-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**LUIS ALBERTO TOBIAS CUEVAS,**                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                        **Appellee.**

---

### On appeal from the 389th District Court
### of Hidalgo County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Chief Justice Valdez

Appellant, Luis Alberto Tobias Cuevas, raises three issues in his appeal from his convictions for murder and possession of marijuana. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011); TEX. HEALTH & SAFETY CODE ANN. § 481.121(b)(5) (West 2010). We affirm.

## I. BACKGROUND

On March 21, 2009, a truck driver discovered the body of 23-year-old Arnulfo Calderon Hernandez, Jr. ("Elmo") lying in the middle of the road on 8 Mile Line in Mission, Texas. He appeared to have suffered multiple gunshot wounds and did not have a pulse. There were marks on the road indicating that the decedent's body had struck the roadway and then been dragged.[1] There was also a large amount of shattered glass near the drag marks on the roadway and near the decedent's body.

During the ensuing investigation, law enforcement authorities learned from the decedent's father that the decedent had been staying with appellant. Investigators went to the apartment rented by appellant, but no one was home. They observed a parked car, a black Grand Am, with a broken front passenger window and damage consistent with a bullet hole. Small dots of blood were visible on the dashboard.

The investigators decided to obtain a search warrant for the vehicle, the apartment, and the adjacent garage. After obtaining the search warrant, investigators processed the vehicle for any weapons, casings, or projectiles that could have been used at the crime scene. A projectile was found on the passenger side floorboard and an empty casing was found on the rear floorboard. Another empty casing and a cell phone were found in the driver's side floorboard. The front passenger seat had a bullet hole, and a projectile was retrieved from within the seat. There were apparent blood stains on the front passenger's side seatbelt. Blood swabs were obtained from the seatbelt and from the front dashboard. Broken glass from the car was collected for comparison with the broken glass found at the crime scene.

---

[1] Crime scene specialist Oscar Gonzalez, Jr. testified that, based upon the amount of marks on the decedent's body, he was able to conclude that the decedent had either been thrown out of a vehicle or run over.

2

The police also collected trash outside the apartment that appeared to have blood on it, as well as a blood-stained handkerchief, which was recovered from the top of a trashcan. Inside the garage attached to the apartment, police discovered a bed with several bundles of marijuana on it. They also discovered several bundles of marijuana in an ice chest. Altogether the police recovered fourteen bundles of marijuana weighing approximately 252 pounds. They also found photographs of appellant, as well as a phone bill in appellant's name.

The blood samples obtained from appellant's vehicle and a sample of the decedent's blood were sent to a laboratory for analysis. A warrant was issued for appellant's arrest after the police received the results of the lab work; however, the police were not able to locate appellant at that time.

On August 31, 2009, a sheriff's deputy pulled over a maroon Crown Victoria in connection with an aggravated robbery. After the vehicle pulled over, appellant opened the passenger-side door. The deputy ordered appellant to stay by the vehicle, but he stepped out of the vehicle and fled on foot. The deputy chased appellant and ordered him to stop, but he continued to run. The surveillance units that were with the deputy assisted her in the chase. At one point, one of the officers drew a weapon and ordered appellant to the ground, but he did not comply and again took off running. Appellant was ultimately intercepted by another surveillance unit. He continued to resist arrest as the officers attempted to handcuff him.

Appellant pled not guilty to charges of murder and possession of marijuana. During the jury trial that followed, the decedent's father testified that his deceased son and daughter-in-law had one child and were expecting a second child. He testified that

3

his son and appellant had grown up together and that his son had been staying with appellant in a house behind a carwash shop. The last time he saw his son alive was around 2:00 p.m. on March 20, 2009, when appellant and his son came over to his house. Appellant was driving a Grand Am.

Hector Montelongo, the decedent's cousin, testified that he went to appellant's apartment on March 21, 2009 and purchased a sack of marijuana from appellant for $10.00. Montelongo testified that the decedent was at the apartment and was wearing a gray Low Rider shirt and black and white shoes. His description matched the clothes the decedent was wearing at the time of his death. Montelongo testified that he has never seen anyone but appellant drive appellant's black Grand Am.

David Molina, a friend of the decedent, testified that he saw appellant and the decedent together when they had visited his house during the week of the murder. They were in a black Grand Am and appellant was driving. Appellant told Molina that he and the decedent were planning to go to the beach for the weekend. Molina tried to call appellant at 10:00 p.m. on Saturday, March 21, 2009, but appellant's phone was disconnected. Molina testified that appellant never let anyone else drive his car.

Jesus Villarreal, the owner of Western Drive Through, located a few blocks from appellant's apartment, testified that he saw appellant and the decedent in a black car two to three days before he gave a statement to the police on March 24, 2009. Villarreal testified that they purchased an 18-pack of beer around noon and gave him a partial payment of $10.00.

The autopsy of the decedent revealed that he had been shot five times. Dr. Norma Jean Farley testified that there were two gunshot wounds to the left side of the

4

decedent's face and one gunshot wound to the posterior lateral left neck. The gunshot to the neck went through the cervical vertebrae, severing the spinal cord in half. The gunshot wounds to the decedent's face and neck had powder tattooing, indicating that the gun was fired from an intermediate range about two to three feet from the decedent.

A fourth gunshot wound entered and exited the decedent's right arm before entering his chest. The bullet fractured a rib, perforated his left lung, and lacerated his right kidney and the liver. The fifth gunshot wound entered the left chest, fractured a rib, travelled through the left lung, lacerated the heart, ruptured the aorta, fractured the vertebrae, and travelled through the right lung. The bullet was recovered from the right side of the decedent's back.

The decedent also had abrasions on his nose, face, forehead, and scalp. There were v-shaped lacerations to the scalp which were associated with scalp hemorrhage and subarachnoid hemorrhage.

A toxicological test of the decedent's blood revealed the presence of alcohol, marijuana, and cocaine. Dr. Farley concluded that the decedent's death was caused by the gunshot wounds to his neck and torso. Dr. Farley also testified that if the decedent had been in the passenger seat of a car at the time he was shot, the gunshots would have been fired from the driver's side of the vehicle.

Richard Hitchcox, a forensic firearm and tool mark examiner with the Texas Department of Public Safety ("DPS") Crime Laboratory in McAllen, Texas, performed an analysis on the bullets recovered from appellant's vehicle and determined that they were .45 caliber bullets fired from the same firearm. The three cartridge cases were also fired from the same firearm.

5

Melissa Valadez, the trace section manager for the DPS Crime Laboratory in Austin, Texas, testified that the fragments of glass recovered from the crime scene and from appellant's car were similar in color, fluorescence, thickness, refractive index, and elemental composition. She concluded that the glass fragments could share a common source.

Aaron Schlum, a DNA analyst at Chromosomal Laboratories, testified that the DNA profiles from the swabs of the vehicle's dashboard and the seatbelt were consistent with the DNA profile from the blood sample procured from the decedent. The probability that an unrelated individual could have had the same DNA profile was one in one hundred billion. Schlum testified that a partial DNA profile was obtained from a sample of cloth cut out of the passenger seat, and the profile frequency was also one out of one hundred billion people.

Edna Zavala, a forensic scientist with DPS, testified that a presumptive test for blood performed on the handkerchief yielded positive results. The DNA profile from the bandana was consistent with a mixture of the decedent and appellant. Zavala testified that neither the decedent nor appellant could be excluded as a contributor of the DNA profile that was obtained from a swabbing of the vehicle's steering wheel.

The jury found appellant guilty of murder and possession of marijuana, as charged in the indictment. The court assessed a 50-year prison term for murder and a 20-year prison term for possession of marijuana, to run concurrently. This appeal ensued.

## II. EVIDENCE OBTAINED BY ILLEGAL SEARCH

In his first issue, appellant complains that the trial court erred by failing to exclude evidence that was obtained as a result of an illegal search. Appellant's first issue consists of three sub-issues: (1) the search warrant affidavit in this case did not establish probable cause with regard to the offense of murder; (2) the affidavit did not establish probable cause with regard to the offense of possession of marijuana; and (3) the affidavit was not sworn before an officer authorized to administer oaths or officially certified under the seal of office.

### A. Applicable Law

The Fourth Amendment commands that no warrants, either for searches or for arrests, shall issue except on probable cause. U.S. CONST. amend. IV. Texas law also requires probable cause for issuance of a search warrant:

> No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance. A sworn affidavit setting forth substantial facts establishing probable cause shall be filed in every instance in which a search warrant is requested.

TEX. CODE CRIM. PROC. ANN. art. 18.01(b) (West Supp. 2011). The requirement of probable cause is met by a sworn affidavit containing sufficient facts showing probable cause: (1) that a specific offense has been committed; (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed the offense; and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched. TEX. CODE CRIM. PROC. art. 18.01(c).

7

### B. Standard of Review

We review a trial court's ruling on a motion to suppress for abuse of discretion, using a bifurcated standard. *See Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). Generally, with respect to a suppression ruling, the trial court's findings of historical fact supported by the record, as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor, are given "almost total deference." *Guzman*, 955 S.W.2d at 89. A de novo standard is applied to a trial court's determination of the law and its application of law to the facts that do not turn upon an evaluation of credibility and demeanor. *Id.* We will uphold a trial court's ruling on a motion to suppress if the ruling is reasonably supported by the record, and the ruling is correct under any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

When the trial court determines probable cause to support the issuance of a search warrant, there are no credibility determinations; rather, the trial court is constrained to the four corners of the affidavit. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). Accordingly, when we review the magistrate's decision to issue a warrant, we apply a highly deferential standard because of the constitutional preference for searches to be conducted pursuant to a warrant as opposed to a warrantless search. *Id.* As long as the magistrate had a substantial basis for concluding that probable cause existed, we will uphold the magistrate's probable cause determination. *Id.*

We are instructed not to analyze the affidavit in a hyper-technical manner. *Id.* The Court of Criminal Appeals recently explained the standard of review as follows:

[When] reviewing a magistrate's decision to issue a warrant, trial and appellate courts apply a highly deferential standard in keeping with the constitutional preference for a warrant. Thus, when an appellate court reviews an issuing magistrate's determination, that court should interpret the affidavit in a commonsensical and realistic manner, recognizing that the magistrate may draw reasonable inferences. When in doubt, we defer to all reasonable inferences that the magistrate could have made.

*Id.* (citing *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007)).

Since the Fourth Amendment strongly prefers searches to be conducted pursuant to search warrants, the United States Supreme Court has provided incentives for law-enforcement officials to obtain warrants instead of conducting warrantless searches. *Id.* One incentive is a less-strict standard for reviewing the propriety of a search conducted pursuant to a warrant. *Id.* (citing *Ornelas v. United States*, 517 U.S. 690 (1996)). In this situation, courts must give great deference to the magistrate's probable-cause determination. *Id.* Both appellate courts and trial courts alike must give great deference to a magistrate's implicit finding of probable cause. *Id.* at 271-72.

An evaluation of the constitutionality of a search warrant should begin with the rule that "the informed and deliberate determinations of magistrates empowered to issue warrants are to be preferred over the hurried action of officers who may happen to make arrests." *Id.* at 272. Probable cause exists when, under the totality of the circumstances, there is a "fair probability" that contraband or evidence of a crime will be found at the specified location. *Id.* It is a "flexible and non-demanding standard." *Id.* The facts stated in a search affidavit "must be so closely related to the time of the issuance of the warrant that a finding of probable cause is justified." *Id.*

## C. Analysis

### 1. Probable Cause as to Murder

In sub-issue one, appellant argues that the magistrate had no probable cause to issue a search warrant for evidence of murder. Appellant contends that "there are no inferences to be drawn from within the four corners of the affidavit" "because there is no mention in the affidavit of any connection between appellant and Hernandez's death." We believe the following excerpts from the affidavit contradict appellant's assertion that there are "no facts in the affidavit to establish any connection between appellant and the murder of Hernandez":

> Affiant has good reason to believe, does believe, and hereby suspects that on or about March 21st, 2009 in Hidalgo County, Texas, the suspected party committed an offense against the laws of the State of Texas, to-wit, Murder: On said date and said place he is suspected of intentionally and knowingly discharging a firearm at Arnulfo Calderon Hernandez (D.O.B. 04/18/1986), causing his death.

> Affiant has probable cause for said belief by reason of the following facts and circumstances:

> On March 21st, 2009, at 1:24 P.M., Hidalgo County Sherriff's Office Patrol Deputies were dispatched to 8 Mile Line between Bryan Road and Stewart Road, on the roadway, Mission, Hidalgo County, Texas regarding a dead human body later classified as a Murder. The victim was identified as Arnulfo Calderon Hernandez. The investigation revealed that Arnulfo had apparent gunshot wounds. Sherriff's investigators observed broken pieces of glass at the crime scene. The glass appeared to be from a vehicle window.

> Sherriff's investigators learned that Arnulfo was staying with a male subject identified as [appellant]. Through the investigation it was learned that [appellant] resides at 1105 North Alton Boulevard, Alton, Hidalgo County, Texas.

> Sherriff's investigators proceeded to the aforementioned address to interview [appellant]. While attempting to make contact with [appellant], Sherriff's investigators observed a black Pontiac four (4) door bearing Texas License Plate number PPK-407. Sherriff's investigator's observed

that the vehicle's front passenger door window was broken. Broken glass was observed on the front passenger floor door. It was also observed [that] the passenger side door had damage consistent with a bullet hole.

We believe that, under the totality of the circumstances set forth in the affidavit, the magistrate had a sufficient basis to find that there was a fair probability that contraband or evidence of a crime would be found at appellant's residence. *See id.* Accordingly, we overrule appellant's first sub-issue.

### 2. Probable Cause as to Possession of Marijuana

In sub-issue two, appellant argues that the magistrate had no probable cause to issue a search warrant for evidence of possession of marijuana. On appeal, the State concedes this point, but argues that sub-issue two should be overruled because appellant waived the error, if any, in the admission of such evidence by telling the trial court he had "no objection" to the evidence when the State offered it at trial. We agree. *See Holmes v.* State, 248 S.W.3d 194, 199 (Tex. Crim. App. 2008) ("In this case, appellant affirmatively waived his right to have the trial judge determine the admissibility of the crack pipe by stating 'No objection' when the State offered that evidence. He therefore waived any claim on appeal that the trial court erred in admitting that evidence. He could not now claim that, as a matter of law, the crack pipe was illegally obtained."). Moreover, even if appellant's complaint had not been waived, we would still conclude that his argument has no merit because the marijuana was in plain view. *State v. Dobbs*, 323 S.W.3d 184, 187 (Tex. Crim. App. 2010) ("A police officer who is lawfully on private premises pursuant to a warrant (or some legitimate exception to the Fourth Amendment requirement of a warrant) may also seize anything he discovers in plain view on those premises if it is 'immediately apparent' to him—that is to say, if he

11

has probable cause to believe—that it constitutes contraband, without the necessity of obtaining a second warrant to justify the seizure."). Accordingly, appellant's second sub-issue is overruled.

### 3. Defects in Affidavit

In sub-issue three, appellant argues that the search warrant was invalid because the affidavit was technically defective in that it was sworn to and subscribed before a magistrate who is only identified by the signature "M." Appellant argues that it is therefore impossible to determine whether the affidavit was sworn before an officer who was authorized to administer an oath. The State points out that article 18.14 of the Texas Code of Criminal Procedure requires only that a search warrant be dated and signed by the magistrate. TEX. CODE CRIM. PROC. ANN. art. 18.04(4) (West 2005); *Gish v. State*, 606 S.W.2d 883, 885 (Tex. Crim. App. 1980) (requiring "only that a search warrant be dated and signed by the magistrate" and holding that a search warrant is not invalid because the magistrate's "office is not named in the body of the warrant, or in connection with his signature").

We agree with the State's argument. We note that at the hearing on appellant's motion to suppress, it was established that the warrant was signed by the Judge of the 92nd District Court. *See* TEX. CODE CRIM. PROC. ANN. art. 18.01(c) (authorizing district court judges to issue search warrants). We also find it significant that appellant did not raise this complaint or obtain a ruling on it at trial. *See* TEX. R. APP. P. 33.1(a). Accordingly, sub-issue three is overruled.

We have considered each of the three sub-issues fairly included in appellant's first issue and have overruled each. Appellant's first issue is therefore overruled.

### III. Testimony by Unqualified Expert

In his second issue, appellant complains that Aaron Schlum's expert testimony regarding DNA profiling was inadmissible because she was not qualified as an expert.

#### A. Applicable Law

The rules of evidence require a trial judge to make three separate inquiries, which must all be met before admitting expert testimony: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.* Only the first condition is at issue in this case.

The mere fact that a witness "possesse[s] knowledge and skill not possessed by people generally . . . does not in and of itself mean that such expertise will assist the trier of fact regarding the issue before the court." *Id.* And because a witness will not always qualify as an expert merely by virtue of a general background, qualification is a two-step inquiry. *Id.* A witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background "goes to the very matter on which [the witness] is to give an opinion." *Id.*

The proponent must "establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.* at 132.

**B. Standard of Review**

An appellate court reviewing a trial court's ruling on the admissibility of evidence must utilize an abuse-of-discretion standard of review. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Prystash v. State*, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999). In other words, the appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Weatherred*, 15 S.W.3d at 542; *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). In addition, the appellate court must review the trial court's ruling in light of what was before the trial court at the time the ruling was made. *Hoyos v. State*, 982 S.W.2d 419, 422 (Tex. Crim. App. 1998); *Hardesty v. State*, 667 S.W.2d 130, 133 n. 6 (Tex. Crim. App. 1984).

"[B]ecause the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Vela*, 209 S.W.3d at 136. When a trial judge determines that a witness is or is not qualified to testify as an expert, "appellate courts rarely disturb the trial court's determination." *Id.*

**C. Analysis**

At trial, the State established that Schlum is employed as a DNA analyst at Chromosomal Laboratories in Phoenix, Arizona, which is accredited by DPS. She has a bachelor's degree in biology and a master's degree in forensic DNA. She has been doing "DNA work" for approximately six years. Schlum testified that she is required to receive monthly training "through literature" and she is required to undergo additional

14

training "outside of the job in the related field." She has previously testified in court as an expert witness in the area of DNA comparison.

On voir dire examination, Schlum testified that she undergoes yearly proficiency testing that is required by the Federal Bureau of Investigation ("FBI"). She has never taken an annual certification through DPS or undergone evaluation by DPS.

Appellant objected to Schlum's testimony because she has not been qualified as an expert in the State of Texas and because she was not qualified pursuant to DPS rules and regulations. The trial court overruled the objection and permitted Schlum to testify. Subsequently, appellant moved for a mistrial, arguing that Schlum should not have been allowed to testify:

Appellant: [S]ince she did not perform her proficiency testing every 180 days, her analysis and her results should not be admitted into this Court. I don't question her education. I don't question the laboratory being certified. But she personally has not undergone the requisite proficiency testing . . . .

The Court: It's not a legislative regulation, is it? It's not a legislative regulation. It's not a law.

Appellant: It's an administrative regulation that sets forth the requirements so they can testify.

During a hearing held outside the presence of the jury, appellant was permitted to offer further testimony on this issue from Vanessa Nelson, section supervisor in the DNA lab at the DPS Crime Lab in McAllen, during which the following exchange took place:

The Court: What happens if you're not proficiency tested?

Witness: If you're not proficiency tested - -

The Court: Just cut to the chase.

Witness: - - you won't get accredited.

15

The Court: Okay. But if - - the bottom line, if you still have a lab that's accredited, then what, if the analyst who did the test has not done their proficiency test?

Witness: If it's not caught during the audit, they may still be accredited. If it's caught during an audit - - they're not supposed to be working casework and so they would have to undergo a competency test and then get back into the proficiency testing schedule.

Court: But that's not to say that that person's not capable of actually doing the testing, just that they haven't gone through the [proficiency] testing.

Witness: That's right.

. . .

The Court: So if someone has been accredited by the DPS, which apparently now is the law, you have to be accredited by the DPS, then what is the Court to assume? If - - whatever lab, it doesn't matter, your lab, an Arizona lab, a Florida lab, if they're accredited, am I to assume that they've passed their audits or - -

Witness: Yes, ma'am. You would assume that they would have had to have been proficiency tested because they passed their audit because they're accredited.

After hearing this testimony, the trial court denied appellant's motion for mistrial. Then, appellant requested that the trial court "strike all evidence as it relates to Aaron Schlum," and the following exchange took place:

Appellant: The lab may have been accredited. There's no testimony that the lab was not accredited, but Aaron Schlum - - I mean, this testimony clearly states, look, if you want to be qualified as an expert, and I'm going to extend it more than she said, then you've got to, at a minimum, proficiency test once a year. The twice a year is for laboratories that participate in the FBI database. That's not the issue. The issue is, is that person required to actually test at least once a year to maintain her individual proficiency which affects the laboratory qualification as a lab.

16

> And then my position is that she clearly stated - - that's uncontroverted on her own statement that she has not proficiency tested in five years . . . .

The State: Judge, she testified that she was working for an accredited lab by the Department of Public Safety. She was qualified as an expert by this Court.

. . .

The Court: The problem is . . . that they've actually been recognized, okay. They have been recognized. There's no one here that tells me that the lab from Arizona has not been accredited and recognized by DPS.

. . .

Appellant: Well, we will just prepare a brief and file it tomorrow morning, Judge.

. . .

The Court: And make sure you brief the part that you didn't object to it when it actually took place.

Appellant: I'm not sure what part that is, Judge, but I'm sure the Court - -

The Court: Because you have to make your objections at the appropriate time.

Appellant: I understand that, Judge.

The Court: Okay. You haven't. You're now objecting to it after the fact - - actually, after it's actually been done and over with. So brief that too.

Appellant has not demonstrated that the trial court abused its discretion in qualifying Schlum as an expert. In the foregoing exchange, appellant clearly stated that "if you want to be qualified as an expert . . . then you've got to, at a minimum, proficiency test once a year." During voir dire, Schlum testified that she undergoes "yearly proficiency testing that's required by the FBI." Thus, there is no merit to

17

appellant's complaint that Schlum is not qualified as an expert because she failed to undergo yearly proficiency testing. Appellant's second issue is overruled.

## IV. SUFFICIENCY OF THE EVIDENCE

Appellant's third issue consists of two sub-issues: (1) the evidence is legally insufficient to support his conviction for murder; and (2) the evidence is legally insufficient to support his conviction for possession of marijuana.

### A. Standard of Review

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899-99 (Tex. Crim. App. 2010) (plurality op.) (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt"). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Id.* (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)). We must resolve any inconsistencies in the testimony in favor of the verdict. *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

In reviewing the legal sufficiency of the evidence, we look at events occurring before, during, and after the commission of the offense, and we may rely on actions of

18

the appellant that show an understanding and common design to do the prohibited act. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Each fact need not point directly and independently to the appellant's guilt, so long as the cumulative effect of all the incriminating facts is sufficient to support the conviction. *Id.*

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 307 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

### B. Murder

Under a hypothetically correct jury charge, the State was required to prove beyond a reasonable doubt that appellant intentionally or knowingly caused the death of the decedent. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). In arguing that the State failed to meet its burden, appellant incorporates the arguments and authorities set forth in his first and second issues:

> The evidence obtained in the illegal search was not admissible. Without that evidence, the State has no case to present. Moreover, the admission of DNA profiling testimony by Aaron Schlum was error because, having failed to complete required proficiency exams, she was not qualified as an expert and her opinions are not reliable. The lack of credible DNA evidence in this case renders the evidence insufficient for a conviction.

We have already addressed and overruled appellant's first and second issues; however, even if we had found error, the standard of review instructs that "we must consider all

19

evidence, even improperly admitted evidence, when conducting a legal or factual sufficiency analysis." *Gardner v. State*, 306 S.W.3d 274, 286 n.6 (Tex. Crim. App. 2009).

Appellant also challenges the legal sufficiency of the evidence to prove his identity as the person who committed the murder. *See Wilson v. State*, 581 S.W.2d 661, 668 (Tex. Crim. App. 1979) ("[T[he State must always establish the identity of the accused as an element of its case in chief."). At trial, no witnesses testified to seeing appellant commit the murder. Nevertheless, the State is permitted to prove identity through circumstantial evidence. *See Gardner*, 306 S.W.3d at 285 ("Although no eyewitness testified in court to seeing appellant shoot Tammy or even to seeing him in Texas on the day that she was shot, the State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence."); *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) ("Evidence as to the identity of the perpetrator of an offense can be proved by direct or circumstantial evidence."); *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. denied) ("When there is no direct evidence of the perpetrator's identity elicited from trial witnesses, no formalized procedure is required for the State to prove the identity of the accused. Proof by circumstantial evidence is not subject to a more rigorous standard than is proof by direct evidence. For the purposes of proving guilt beyond a reasonable doubt, direct and circumstantial evidence are equally probative.") (citations omitted).

In this case, the State presented evidence that the decedent had been living with appellant at the time the murder occurred. There was also evidence that appellant was

the last person seen with the decedent while the decedent was still alive. *Torres v. State*, 141 S.W.3d 645, 660-62 (Tex. App.—El Paso 2004, pet. ref'd) (addressing legal sufficiency challenge in murder case and considering evidence that defendant was last to see decedent alive and was last seen with decedent); *Reeves v. State*, 969 S.W.2d 471, 477-80 (Tex. App.—Waco 1998, pet. ref'd) (addressing legal sufficiency challenge in murder case and considering evidence that the defendant was the last one to see the decedent alive and he had the best opportunity and motive for killing her).

The decedent's father saw his son with appellant the day before the murder. At that time, appellant was driving a black Grand Am.

The decedent's cousin, Montelongo, testified that he saw the decedent with appellant at appellant's home on the day of the murder. Montelongo was able to accurately describe the clothes that the decedent had been wearing that day.

The decedent's friend, Molina, testified that he saw the decedent with appellant on the week of the murder. Appellant and the decedent were in a black Grand Am and appellant was driving. Molina testified that appellant never let anyone else drive his car.

The owner of Western Drive Through, Villarreal, testified that he had seen the decedent with appellant on either the Saturday the murder occurred or the day before. They were in a black car and they had picked up an 18-pack of beer.

On the afternoon of Saturday, March 21, 2009, a truck driver discovered the decedent's body dumped in the middle of the road on 8 Mile Line. There were marks on the road from where the decedent's body had struck the roadway and been dragged. The decedent had been shot five times. Dr. Farley testified that if the decedent had

21

been in the passenger seat of a car at the time he was shot, the gunshots would have been fired from the driver's side of the vehicle.

The police discovered a black Grand Am with a broken passenger side window parked in an awkward space at the back of appellant's home. There was blood and broken glass inside the vehicle. The shattered glass the police recovered from the crime scene was similar in color, fluorescence, thickness, refractive index, and elemental composition with the shattered glass found in and around appellant's car.

Empty casings and a bullet were found on the vehicle's floorboard. The police retrieved another bullet that was lodged in the back part of the passenger seat. Police observed blood stains on the passenger side seatbelt. There were also small dots of blood on the dashboard. The DNA profiles obtained from the blood on the dashboard and the seatbelt were consistent with the DNA profile obtained from a sample of the decedent's blood. The police also retrieved a blood-stained bandana from appellant's trashcan. The DNA profile from the bandana was consistent with a mixture of the decedent's and appellant's DNA.

Finally, appellant fled after the murder. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2008) ("[A] factfinder may draw an inference of guilt from the circumstance of flight."). Appellant was not apprehended until a vehicle in which he was a passenger was pulled over by law enforcement. At that time, appellant exited the vehicle and ran from police. Appellant resisted arrest after he was caught.

Based on the foregoing, we believe a rational trier of fact could conclude beyond a reasonable doubt that appellant intentionally or knowingly caused the death of the decedent. Accordingly, appellant's first sub-issue is overruled.

22

### C. Possession of Marijuana

Under a hypothetically correct jury charge, the State was required to prove that appellant knowingly or intentionally possessed a quantity greater than 50 but less than 2,000 pounds of marijuana without legal authority to do so. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121. To prove the element of unlawful possession, the State was required to prove appellant: (1) exercised control, management, or care over the marijuana; and (2) knew the substance possessed was contraband. *See Blackman v. State*, 350 S.W.3d 588, 594 (Tex. Crim. App. 2011). The State must establish, either by direct or circumstantial evidence, that appellant's connection with the contraband was more than merely fortuitous. *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995). Evidence that "affirmatively links" appellant to the contraband is sufficient to prove that he possessed it knowingly. *Id.*

The evidence at trial established that police recovered fourteen bundles of marijuana weighing approximately 252 pounds from the garage attached to appellant's apartment. They also found pictures of appellant and a phone bill in appellant's name inside the garage. Cameras had been installed on the outside of the structure and appellant had surveillance equipment which displayed the roadway in front of the building.

In addition, the decedent's cousin testified that he went to appellant's apartment on March 21, 2009, the same day the decedent's body was found, and paid appellant $10.00 for a sack of marijuana, which appellant retrieved from the refrigerator. From this testimony, the jury could have reasonably believed that appellant was in the custom of selling marijuana, that he exercised control over the marijuana, and that he did, in

23

fact, have knowledge that the substance was illegal contraband. Accordingly, appellant's second sub-issue is overruled.

We have considered both of the sub-issues fairly included in appellant's third issue and have overruled each. Appellant's third issue is therefore overruled.

## V. CONCLUSION

The judgment of the trial court is affirmed.

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
2nd day of August, 2012.