

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00107-CR

———————————————————

MARK PHELPS ANDREWS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1441741D

---

Before Sudderth, C.J.; Gabriel and Kerr, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

A jury found appellant Mark Phelps Andrews guilty of murdering his wife, Doris,[1] and assessed his punishment at life imprisonment. *See* Tex. Penal Code Ann. § 19.02(b)(1), (2). After the trial court sentenced Andrews, he appealed, contending in one issue that the evidence is insufficient to support his conviction. We affirm.

## The Indictment

The State alleged that Andrews, on or about January 8, 2016, intentionally or knowingly caused Doris's death by striking her with a hammer. *See id.* § 19.02(b)(1). In the alternative, the State alleged in another paragraph that on or about the same date, Andrews intentionally committed an act with the intent to cause Doris serious bodily injury and that was clearly dangerous to human life, namely, he struck her with a hammer and caused her death. *See id.* § 19.02(b)(2).

## Andrews's Argument

Andrews does not dispute that someone bludgeoned his wife to death with a hammer while she was asleep in her bed. Rather, he disputes whether the evidence shows that he was that person.

According to Andrews, the evidence does nothing more than raise a suspicion, and as he correctly notes, even a strong suspicion falls short of proving guilt. *See*

---

[1]For clarity, in this opinion we will use "Andrews" to refer to the appellant but first names in referring to Doris Andrews and to housemates and trial witnesses Don and Amy Skaggs.

2

*Winfrey v. State*, 393 S.W.3d 763, 769 (Tex. Crim. App. 2013). He concedes, though, that the suspicion emanates from his having both the motive and the opportunity to murder Doris:

- he had many debts;

- Doris had named him the beneficiary of her life insurance; and

- he and Doris lived together.

But, Andrews argues, many indebted persons are their spouses' beneficiaries; this does not prove that beneficiaries are murderers. Certainly, factfinders may consider motive and opportunity, but in Andrews's view, motive and opportunity—without more—are not enough to prove guilt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Beyond motive and opportunity, Andrews contends that the remaining evidence permitted the jurors to do no more than speculate that he murdered his wife. Although juries may draw multiple reasonable inferences if evidence supports them, juries may not reach conclusions based on mere speculation, inferences, or presumptions lacking factual support. *See Winfrey*, 393 S.W.3d at 771.

**Standard of Review**

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict

3

to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

Circumstantial evidence is as probative as direct evidence in establishing guilt, and indeed circumstantial evidence alone can establish guilt. *Winfrey*, 393 S.W.3d at 771; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). An inference is a

4

conclusion reached by considering other facts and deducing logical consequences from them, while speculation is mere theorizing or guessing about the meaning of facts and evidence presented. *Winfrey*, 393 S.W.3d at 771; *Hooper*, 214 S.W.3d at 16. A conclusion reached by speculating is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Winfrey*, 393 S.W.3d at 771; *Hooper*, 214 S.W.3d at 16.

## Discussion

For the reasons given below, viewing the evidence in the light most favorable to the verdict, we hold that the evidence sufficed to show circumstantially that Andrews bludgeoned his wife to death with a hammer. *See Queeman*, 520 S.W.3d at 622. And we further hold that evidence supports the inferences that the jury needed to draw in making such a finding. *See Winfrey*, 393 S.W.3d at 771.

### A. Background

As of January 2016, Amy and Don Skaggs had been living slightly more than four months with Andrews, Doris, and the Andrewses' 9-year-old special-needs daughter, K.J. Don and Andrews had worked together at a trucking company, but health reasons—Paget's disease, gout, and back problems—later prevented Don from working. Part of the living arrangement was that Andrews would pay Amy to cook, clean, and help care for K.J.

Completing the household were three dogs—Diesel, Sparky, and Tanker—that barked loudly at strangers. One witness described the dogs' barks as "high-pitched"

5

and "yippee"—the sort that made good burglar alarms. Diesel would even bite. At night, Diesel would sleep on Doris's pillow near her head, and Sparky would find a comfortable spot along Doris's legs.

Nightly routines were not unique to the dogs. Andrews would leave around 3:00 a.m. every morning to drive to a casino and return around 8:00 a.m. or sometimes later. Since leaving his trucking-company job in 2015, Andrews had become a self-proclaimed professional gambler. In June 2015, Andrews won—after taxes—a jackpot of about $200,000 playing Texas Hold 'Em poker.

## B. The Murder

On January 8, 2016, Andrews deviated from his routine.

At 4:30 a.m. while both Amy and Don were sound asleep, Andrews threw open their bedroom door, slammed it into the wall, and screamed for them to call 9-1-1, while two of the dogs launched themselves onto the Skaggses' bed.

Amy testified that she did not know what was going on and thought perhaps the house was on fire or that a car had wrecked near their house. Whatever had happened, she remembered that the dogs had neither barked nor raised any other commotion.

Don called 9-1-1 while Amy followed Andrews, who had run back toward the Andrewses' bedroom. Entering that bedroom, Amy saw Andrews standing beside Doris and screaming her name into her face. Blood was under Doris's nose and had pooled on her chest. A comforter covered Doris from the waist down.

Amy left the bedroom to find Don and told him, "[I]t's Doris. There's blood everywhere." After that, Amy went into K.J.'s room and found her awake. From there, Amy went to the living room, where the morning took yet another unexpected turn.

Andrews came out of his bedroom with a gun and pointed it at Amy's face. She described the look on Andrews's face as "deranged" and added, "I was scared."

Next, Andrews swung the gun and stuck it in Don's face. Don thought that if he had entered the Andrewses' bedroom, he would have been Andrews's next victim. As it was, Don felt that the only reason Andrews had not shot him was because Don was still on the phone with 9-1-1.

Asserting that someone was still in the house, Andrews then began going room to room. Amy described how Andrews checked an empty bedroom, the Skaggses' bedroom, and even the water-heater closet, but she noted that the one bedroom left unchecked was K.J.'s.

Meanwhile, the 9-1-1 operator repeatedly asked Don if Doris was breathing. Amy commented, "Of course, I knew she wasn't, but they wanted [someone] to verify," so she went back to the Andrewses' bedroom and saw Andrews on top of Doris doing chest compressions. From what Amy had seen earlier, she knew that chest compressions would not help.

But this time Amy saw something else in the Andrewses' bedroom—a hammer on the rug beside the bed. After Amy screamed that there was a hammer on the floor,

Andrews "got this really, you know, shocked look on his face" with an open mouth and wide eyes. Amy found the hammer's placement odd: "It was just too perfect. It was right in the center of the rug." She agreed at trial that its placement was "obvious."

After the hammer's discovery, Amy and Don returned to their bedroom, where Don finished getting dressed, and then they went to the living room. Don kept asking the 9-1-1 operator where the police were and was assured that they were just outside. Around this time, Amy noticed that someone had opened the safe that was in the living room. As one of the responding officers observed, the living-room safe was between two large easy chairs and appeared to function as furniture—an end table—because it had various items, such as two remotes, on top of it. According to Amy, Andrews responded dramatically to this new development, too:

> Q. Okay. And did you say anything to Mr. Andrews?
>
> A. Yeah. I said, Mark, the safe is open. And he had the same shock expression, very overly dramatic, you know. You know, like, I can't believe it.
>
> Q. Wide eyes, open mouth?
>
> A. Yes.
>
> Q. Overly dramatic?
>
> A. Yes, sir.

Amy thought that Andrews later told the police that the safe contained $135,000.

After the police had arrived, one of the dogs tried to bite an officer's leg, and the officer had to repeatedly shake the dog loose from his pants. Don put the dogs in the back room. At trial, Don explained that the dogs were "not good with people. So with the police there, they were in a state of aggression." Only after the police arrived did Don recall having a problem with the dogs' behavior. Later, when animal control came to remove the dogs, the dogs were described as "extremely loud" and very agitated. One of the dogs was so aggressive that animal control resorted to using a catch pole to remove it.

When the paramedic arrived, he attempted no life-saving procedures because protocols did not require any efforts deemed meaningless. Summarizing what he had seen, the paramedic said, "She was pulseless. She was not breathing," and he noted "large amounts of blood to her face, her chest, the bedding and the pillow around her" as well as "about a 3-inch laceration to the left side of her—of her head, which looked to [him] to be some exposed skull."

The fire marshal who had been called to the scene to help investigate also agreed that "it [was] plainly obvious" that Doris was dead. He described seeing "significant traumatic injuries to her head and neck, upper chest area."

Amy characterized Andrews as "wailing" loudly but shedding no tears. One of the responding officers also described Andrews as sobbing but tearless and noted that his behavior alternated between wailing and normal.

### C. Additional Information

#### 1. Andrews said and did things that presaged the murder.

Amy remembered Andrews saying in December 2015, "I just feel like Doris is going to die before the end of the year." Only days before Doris's January 8, 2016 murder, Andrews ran a search on his phone for funeral costs.

#### 2. Andrews had abused Doris.

An acquaintance at a church in Arizona that the Andrewses had formerly attended (and at which Andrews and Doris had been interim youth pastors) testified that Doris once confided to her that Andrews had been verbally and emotionally abusive and was becoming physically abusive. Doris showed this acquaintance a bruised eye covered over with make-up, and Doris lifted her shirt to reveal two red marks on her rib area. Doris also told the acquaintance that she was reluctant to leave Andrews because she had just adopted a young girl (K.J.) and because Doris was still raising two daughters from a previous marriage. Doris also confided that she was frightened of how Andrews might respond. Andrews claimed to have had a military background, to know how to kill people, and to know how to make people disappear. Although aware that Andrews had assaulted Doris, the acquaintance acknowledged not going to the police because she too was afraid. She admitted that fearing a fellow church member seemed odd.

Shortly before Doris was murdered, she was at a hair salon when Andrews called and berated her about spending money. The hairstylist commented, "She was

10

trying to not . . . draw attention to herself, but it was kind of hard—you know, I'm sure y'all have seen in the salon we stand kind of close together. So it was obvious what was going on." Doris became emotional, cried, and wanted to leave.

### 3.  The evidence did not support a burglary.

Law enforcement found no signs of forced entry into the house. Doris's cell phone was still on the nightstand next to her bed, and her wallet was at the foot of the bed on a stool. Andrews's wallet was on top of the open living-room safe, which showed no signs of forced entry.

Andrews and his father knew the safe's combination. Andrews's father assumed but did not know definitively that Doris knew the combination too. Although Amy likewise did not know if Doris knew the combination, Don assumed that she did. According to the lead detective, Andrews claimed that only he and Doris knew the safe's combination.

Don acknowledged that the only time he saw someone open the safe, Andrews was that person, and the reason Andrews opened it was to change the combination from six numbers to three. Don always assumed that the safe contained money, but when Andrews opened it to change the combination, it looked empty to Don.

Amy did not believe Andrews's claim that the safe contained $135,000. At the time, money was tight in the household. Andrews had initially paid Amy regularly for helping with K.J., but he paid her erratically toward the end.

11

**4. The Andrewses' finances were in disarray, and Doris's life-insurance policies offered an attractive financial lifeline.**

A forensic financial analyst reviewed the Andrewses' financial records and testified that they lived "outside of their means of what they were earning already before they won the [Texas Hold 'Em] jackpot. And when they won the jackpot, they ran through it fairly quickly, and they did not spend it wisely." She noted that the Andrewses were in "dire straits," were "getting calls from collectors," and "had no money to pay bills."

Debt appeared to explain Andrews's transition from trucking-company employee to professional gambler. In October 2015, just four months after Andrews's big win at the poker table, the Internal Revenue Service filed a $60,000 tax lien against him along with a wage levy against his employer. That same month, Andrews left his job.

Leaving his job gave rise to a financial dispute between Andrews and his former employer. The employer claimed that Andrews had quit, but Andrews asserted that he had been fired and sought unemployment benefits. In the end, the Texas Workforce Commission found that Andrews had quit and denied him any benefits.

Other evidence showed that starting in November 2015 and running through early January 2016, Andrews scammed $9,600 out of a couple that he and Doris had gone to church with. Andrews told them that he was an investment broker and could get them a 20% return on their money in just eight days. Admitting having no clue

what normal stock-market returns might be, the church friend simply relied on and trusted Andrews.

In late November 2015, Andrews refinanced his Lexus (apparently without Doris's knowledge and definitely without her signature), and in mid-December, he pawned two guns for $500. The financial analyst observed at trial that people who pawn items generally do so "[b]ecause they're broke." Later in December 2015, Andrews redeemed the two guns—that is, he paid off the loan and accrued interest and got the guns back.

Both before and after Andrews quit his job, he gambled frequently. An investigator responsible for overseeing the Winstar Casino in Thackerville, Oklahoma, testified that the casino's records showed that in the six months preceding January 6, 2016, Andrews had made 80 trips to the casino and had a net loss of $63,680. And in September 2015, Andrews and Doris had travelled to Las Vegas, where Andrews lost $10,539.99.

Amid his financial woes, the evidence showed that Andrews was Doris's life-insurance beneficiary and that $258,917.81 in insurance benefits had been interpleaded into the court registry. Doris had a second life insurance policy for $100,000 naming Andrews as her beneficiary, but those proceeds had not been interpleaded.

**5. The hammer belonged to Andrews, who kept it in a locked shed, but law enforcement found the shed unlocked.**

Don recognized the hammer that Amy spotted lying conspicuously on the rug next to Doris's bed because he and Andrews had used it to fix the fence only a day or two before Doris's murder. Don remembered handing the hammer to Andrews and remembered Andrews's putting it back in the shed, which was normally locked at night.

But a detective on scene discovered that the shed was not locked. Looped through the U-shaped staple fastened to the doorframe was an opened padlock, and the accompanying hasp—fastened to the door—was swung open. The shed door showed no signs of forced entry.

**6. Andrews had Doris's blood on him.**

Law enforcement found blood on Andrews's clothing—on his jeans, on the inside of his right boot, across his shirt, and on the back of his sleeve. The police also found Doris's blood in the master bathroom, on a towel in the master bathroom, in the hallway, and in the kitchen. Her blood was also on the hammer.

**7. Doris's murderer delivered powerful and numerous blows, something Don was not physically capable of.**

The medical examiner testified that Doris died from multiple penetrating blunt-force injuries primarily to the head but also to the neck and hand. The blows to the head penetrated the brain and the frontal sinus cavity, and the blow to the neck went into the trachea. The blow to the trachea would have prevented Doris from calling for

help: air would have escaped, blood would have filled her airway and prevented any air from moving across the vocal chords, and many of the muscles that help control speech had been damaged. Because a hammer's head end and claw end each leave distinct injuries, the medical examiner could tell that the claw end had caused Doris's injuries. The wounds were extremely deep and would have "almost always" caused immediate loss of consciousness and, "fairly quickly" after that, death. The blows required a great deal of force from someone strong and fit; the medical examiner would not expect someone who was feeble and in ill health to deliver them.

The lead detective had seen Don's physical condition and did not think that Don was physically capable of inflicting Doris's injuries. But Andrews was.

The detective also commented, "[T]here are almost no defensive wounds on Mrs. Andrews at all. She did not put up really any kind of fight at all, which [indicates] that she was sleeping when this occurred." The autopsy photographs show that Doris had one gash and another cut on the top of her right wrist and numerous smaller cuts just below the knuckles on the top of her right hand; because she was lying on her back, her right hand was on the side of the bed closest to her attacker.

### 8. The lead detective interviewed Andrews; the detective's evidentiary observations and Andrews's explanations did not match.

The lead detective interviewed Andrews before a warrant was later issued for his arrest. Andrews asserted that he had left the house around 2:15 a.m. and discovered that he had left money behind at the house, so at 3:54 a.m. he texted Doris

15

that he was on his way back. Other evidence showed that Andrews rarely texted Doris between 3:00 and 4:00 a.m., having done so only four times in the last three years and nine months, including the text sent the morning of Doris's murder. His 3:54 a.m. message had not been opened, meaning Doris had not read it.

Andrews's claim of having left at 2:15 a.m. troubled the detective. Because the distance Andrews supposedly drove would take only 25 to 30 minutes with the light early-morning traffic, the detective thought it was odd that Andrews did not send the text until nearly two hours later.[2] At 4:16 a.m., video from a RaceTrac convenience store located about five minutes from the Andrewses' house captured Andrews purchasing gasoline and a few minutes later—at 4:19 a.m.—two packs of cigarettes.

Andrews told the detective that after getting back home, he initially went into the bedroom to turn off Doris's cell-phone alarm. But two things about this assertion puzzled the lead detective:

- Andrews ostensibly managed to enter the bedroom and turn off the cell phone beside the bed without tripping over the hammer that was placed on the floor directly in his path; and

---

[2]The medical examiner and the detective could not determine when the murder occurred. One officer who responded to the scene thought that the blood had already started to coagulate; this indicated to him that the assault occurred earlier in the morning or the prior evening. And the detective opined that if Andrews had performed CPR on Doris, he would have expected more blood on the bathroom towel and on Andrews. Whether the detective attributed this to the blood's having already coagulated is not clear. At the very least, the detective expressed difficulty reconciling what Andrews had told him with what the physical evidence was telling him.

- cell phones normally illuminate when their alarms go off, so if Doris's cell phone had illuminated, Andrews should have seen her injuries then.

Crime-scene photographs showed that the cell phone also had blood on it.

Andrews maintained that he did not discover his wife's injuries until after he had returned to the bedroom a second time to use the restroom and had turned on the bathroom lights. But once again the detective noted that the physical evidence and Andrews's story did not harmonize very well because the bathroom light switch had blood on it. Crime-scene photos show the light switch still in the "on" position, suggesting that Andrews had blood on his hands when he turned the bathroom lights on.

Next, Andrews claimed to have tried to use Doris's cell phone to call 9-1-1, but the detective noted that her cell phone was neatly placed on the bedside table and was still attached to charging cords. In his opinion, he would expect someone calling or trying to call 9-1-1 to yank those cords from the phone.

Then there was the issue of whether Andrews had gone near the safe that morning, something he made a point of specifically denying even though another detective had found Andrews's wallet on top of the safe.

Another concern for the lead detective was that the bathroom showed signs of someone washing blood off, but Andrews attributed that to his going back into the master bathroom after performing CPR on Doris.

Finally, the 9-1-1 call came in at 4:37 a.m.—18 minutes after Andrews bought cigarettes at the RaceTrac at 4:19 a.m. Because the RaceTrac was only five minutes away from the Andrewses' house, Andrews could have spent at least ten minutes in the house before having Don call 9-1-1. On the RaceTrac video, the lead investigator acknowledged not being able to see any blood on Andrews.

### 9. Andrews had unexplained injuries to his arm and head; the lead detective offered one possible explanation.

Andrews had a small scrape, laceration, or scratch on the back of his head behind his right ear and a small laceration on his left forearm. How Andrews incurred these injuries was not clear. The detective postulated one theory: when an attacker whips a hammer back, the hammer might strike the attacker's own head. Andrews was right handed, and the injury was behind his right ear.

### 10. Andrews: a teller of tall tales.

Outside the jury's presence, Amy stated her belief that Andrews killed Doris. When asked why, she answered, "Probably because everything he ever told us was a lie. Everything."

Amy did not speak so bluntly before the jury, but her testimony describing Andrews's over-dramatic reaction to seeing the hammer and the open safe communicated her skepticism.[3]

---

[3]Her implicit message could well have been, "The [gentleman] doth protest too much, methinks." William Shakespeare, *Hamlet* act 3, sc. 2.

The jury heard other testimony painting Andrews as someone who exaggerated, embellished, and fabricated. According to witnesses, Andrews had variously claimed that

- he owned a car dealership;

- he owned an RV dealership;

- he managed an RV dealership;

- he owned or partially owned a trucking company;

- he was in the special forces while in the military;

- he had been an Army Ranger and had been deployed to Afghanistan and Iraq where he performed several secret missions that he could not talk about;

- he had been shot several times while in the special forces;

- he had performed a tracheotomy on himself while in the military;

- he had been called about the Twin Towers attack;[4]

- he had survived testicular, lung, throat, and bone cancer;

- he owned yachts and liked big boats;

- he had won and lost millions;

- he had attended but had not finished vet school at Texas A & M;

---

[4]The witness who recounted the Twin Towers story commented, "[Andrews told one story] about the Twin Towers that—you know, there was questionable things about the Twin Towers, and that he had gotten a phone call about that. And when I heard that, that was really out there for me, so—but I didn't think anything of it."

- his parents owned a cattle ranch; and

- he was a youth minister and associate pastor at a church.

But the jury heard evidence that the Andrewses rented the house they lived in, that Andrews had worked as a driver and, later, as a dispatcher at a trucking company, and that Andrews and Doris had served as unpaid youth pastors for an interim period when their church had no youth pastor.

When Andrews's father testified, he was asked about being a cattle rancher and responded, "I wouldn't call myself a rancher, no," adding that he had "like four cows."[5]

---

[5]When evaluating sufficiency, we consider only the evidence and testimony that the jury had before it when determining guilt. *See Carballo v. State*, 303 S.W.3d 742, 746 n.3 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing *Barfield v. State*, 63 S.W.3d 446, 450 (Tex. Crim. App. 2001)). During the punishment trial, the jury learned the truth about Andrews's military career. He served in the Air Force for two years, four months, and 17 days from October 16, 1989, until March 2, 1992, which corresponded to Operation Desert Storm but which preceded by about ten years the September 11, 2001 attacks and their aftermath. Andrews was an aircraft-maintenance specialist stationed at Scott Air Force Base in Illinois and was never an officer. He received two awards—one for joining the Air Force during wartime, and another for completing boot camp. He received no commendations for having served overseas or for having been shot. When asked if Andrews's records showed that he had served in special ops or black ops, with the CIA or the Long-Range Reconnaissance Patrol, or as an Army Ranger or a Green Beret, the State's witness responded, "All of [his records] are showing zero. He participated in none of that." Andrews received a general discharge under honorable conditions. Under "Narrative reason for separation," his discharge certificate states, "Misconduct—pattern [of] conduct prejudicial to good order and discipline," which meant that "he got in trouble and didn't do his job."

## Discussion

We conclude that the jury's verdict does not reflect speculation but, instead, rational inferences from various pieces of circumstantial evidence. Whoever murdered Doris

- was no stranger to the three dogs,

- could access the shed without force and find the hammer stored inside,

- could access the house without force, and

- had the physical strength to commit the offense.

Andrews met all these criteria; no one else did.

Prominent too were Andrews's efforts to construct evidentiary facades. Attempts to suppress or fabricate evidence are admissible against a defendant to show that the defendant was conscious of his guilt and that he was guilty as charged. *See Rodriguez v. State*, 577 S.W.2d 491, 492 (Tex. Crim. App. [Panel Op.] 1979); *Brown v. State*, 51 S.W.2d 616, 620 (Tex. Crim. App. 1932) (op. on reh'g); *see also Johnson v. State*, 583 S.W.2d 399, 409 (Tex. Crim. App. [Panel Op.] 1979); *Garza v. State*, 358 S.W.2d 622, 623 (Tex. Crim. App. 1962); *Johnson v. State*, 208 S.W.3d 478, 500 (Tex. App.—Austin 2006, pet. ref'd); *Bryan v. State*, 990 S.W.2d 924, 928 (Tex. App.—Beaumont 1999, no pet.); *Miranda v. State*, 813 S.W.2d 724, 733 (Tex. App.—San Antonio 1991, pet. ref'd). Viewing the evidence in the light most favorable to the verdict, the jury

21

could have found that Andrews went to great lengths to stage various putatively exculpatory scenarios.

For example, the open safe suggested a burglary gone horribly wrong. Although Andrews claimed that there had been $135,000 in the safe, other evidence suggested that he was lying:

- Andrews was scamming church acquaintances for cash;

- he had refinanced his Lexus;

- he was no longer paying Amy consistently;

- debt collectors were calling;

- less than a week before Doris's death, he became upset when she went to a hairstylist; and

- he had recently pawned his guns.

A reasonable inference from this evidence was that Andrews's actions indicated someone who was cash-strapped and not someone who had $135,000 secreted in a living-room safe.

Additionally, other evidence belied a burglary. If a burglar had entered the house, the dogs would have barked. They did not.[6] But assuming a burglar had

---

[6]Sherlock Holmes fans will immediately call to mind "The Adventure of Silver Blaze," a story in *The Memoirs of Sherlock Holmes* collection, in which Holmes deduces that the presumed murderer was someone well-known to the stable dog past which a famous race horse had been led in the night with no fuss from the dog:

successfully gotten past the dogs and had successfully cracked the combination to the safe, the burglar would have had no reason to kill Doris in her sleep. And—for argument's sake—if a burglar had killed Doris, the burglar inexplicably neglected to take her phone and wallet. Further, if the burglar had needed Doris to open the safe, killing her in her sleep would have defeated that purpose, and the idea that Doris was alive to give a burglar the safe's combination but then went back to sleep only to then be murdered makes no sense.

---

> Colonel Ross still wore an expression which showed the poor opinion which he had formed of my companion's ability, but I saw by the inspector's face that his attention had been keenly aroused.
> "You consider that to be important?" he asked.
> "Exceedingly so."
> "Is there any point to which you would wish to draw my attention?"
> "To the curious incident of the dog in the night-time."
> "The dog did nothing in the night-time."
> "That was the curious incident," remarked Sherlock Holmes.

Sir Arthur Conan Doyle, *The Adventure of Silver Blaze*, 12–13, dfw-sherlock.org/uploads/3/7/3/8/37380505/1892_december_the_adventure_of_silver_blaze.pdf (last visited 10/28/19).

And from this fact, Holmes

> had grasped the significance of the silence of the dog, for one true inference invariably suggests others. The . . . incident had shown [him] that a dog was kept in the stables, and yet, though someone had been in and had fetched out a horse, [the dog] had not barked enough to arouse the two lads in the loft. Obviously the midnight visitor was someone whom the dog knew well.

*Id.* at 15.

In short, the jury could have reasonably concluded that Andrews staged the open-safe-and-burglary scenario to mislead the police during the investigation that would inevitably follow Doris's murder.

Another example from which the jury could have concluded that Andrews had set-designed the evidence was the hammer. Someone had left it where others would certainly find it, even though murderers generally try to dispose of incriminating evidence such as murder weapons. *See generally Ex parte Garner*, No. 10-18-00129-CR, 2018 WL 3469834, at *3 (Tex. App.—Waco July 18, 2018, no pet.) (mem. op., not designated for publication); *Arochi v. State*, No. 05-16-01208-CR, 2018 WL 3372919, at *13 (Tex. App.—Dallas July 11, 2018, pet. ref'd) (mem. op., not designated for publication); *Reeves v. State*, 969 S.W.2d 471, 486 (Tex. App.—Waco 1998, pet. ref'd). Presumably Andrews did not intend to incriminate himself, and whether he intended to incriminate Don or some hapless and nameless burglar is not clear. But for our sufficiency-review purposes, the hammer incriminated Andrews:

- it was his hammer that was used to kill Doris;

- Andrews kept the hammer in a shed that he normally locked at night;

- someone entered the shed and took the hammer without having to use force; and

- the shed's padlock was found unlocked and the hasp on the door was swung to its open position.

Because it was Andrews's shed and padlock, a jury could have reasonably inferred that Andrews had the key to the padlock and that he was the person who had entered the shed and retrieved the hammer.

Next, the jury could have reasonably inferred that Andrews's hyper-wrought search for an intruder was further fabrication intended to mislead. Significantly, Andrews checked the water-heater closet but not his young special-needs daughter's bedroom. A rational juror could have reasonably concluded that

- if Andrews truly believed that a dangerous intruder was in the house, K.J.'s bedroom should have been the first place he checked;

- Andrews's not checking his daughter's bedroom showed that he knew she was safe because he knew all along that there was no intruder; and

- checking the water-heater closet was melodrama.

Andrews's hunt for the intruder also featured pointing his gun at both Amy and Don. But for his being on the phone with 9-1-1, Don was persuaded that Andrews would have shot him. To the extent that Andrews was purportedly searching for intruders, neither Amy nor Don fit that definition.

Why Andrews threatened Amy and Don with a gun is unclear. Whatever the reason, for our purposes the only question is whether a jury could have reasonably concluded that Andrews intended this conduct as another red herring of some sort. On this record, the answer is yes.

Another example of apparent misdirection was Andrews's attempt to revive Doris with chest compressions. Amy, the fire marshal, and the paramedic all testified

that Doris was obviously dead, a fact confirmed by crime-scene photographs admitted at trial. Despite that, Andrews administered chest compressions. Jurors could have reasonably concluded that these actions served a disingenuous purpose too.

Andrews had to account for how his wife's blood ended up on his shirt, jeans, and boots, and why her blood was also in the master bathroom and on the bathroom towel. Under these circumstances, a reasonable jury could infer that Andrews performed the chest compressions not to try to save Doris's life but rather to easily explain the blood on his clothing. Such a ploy would also explain why Doris's blood was in the bathroom and on the bathroom towel—after performing the chest compressions, Andrews went to the bathroom to clean himself up.

Finally, Andrews's 3:54 a.m. text informing Doris that he was coming home— when he rarely texted her in the early morning hours—and his fortuitous appearance on the RaceTrac video at 4:16 a.m. and again at 4:19 a.m. could have struck the jury as more examples of Andrews's attempting to fabricate an alibi. When coupled with his other apparent efforts to deceive and deflect, such seemingly calculated attempts to fabricate evidence could allow a jury to reasonably infer Andrews's guilt.

We presume that the factfinder resolved any conflicting inferences in the verdict's favor, and we defer to those resolutions. *See Murray*, 457 S.W.3d at 448–49. Here, the Andrewses were in dire financial straits. The proceeds from Doris's life-insurance policies were sizeable, and Andrews was the named beneficiary. The evidence showed more than mere motive and opportunity; it also pointed to how

26

Andrews brutally murdered his wife and how he planned to get away with it. His efforts to fabricate favorable evidence did more to incriminate than to exonerate. *See Rodriguez*, 577 S.W.2d at 492; *Brown*, 51 S.W.2d at 620.

Viewing all the evidence in the light most favorable to the verdict, then, we hold that a rational factfinder could have found beyond a reasonable doubt that, in the language of the indictment, Andrews intentionally or knowingly caused Doris's death by striking her with a hammer or, alternatively, that Andrews intentionally committed an act with the intent to cause Doris serious bodily injury and that was clearly dangerous to human life, namely, he struck her with a hammer and caused her death. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

We overrule Andrews's sufficiency challenge and affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 7, 2019

27